789 P.2d 603

**STATE of New Mexico**
**Plaintiff–Appellee,**

v.

**Robert HENDERSON, Jr.,**
**Defendant–Appellant.**

**17638.**

Supreme Court of New Mexico.

March 27, 1990.

Jacquelyn Robins, Chief Public Defender, Susan Gibbs, Appellate Defender, Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Freedman, Boyd & Daniels, P.A., Nancy Hollander, Albuquerque, John D.B. Lewis, New York City, amicus curiae, Ass'n on American Indian Affairs, Nat. Youth Council and Jake Whitecrow, Director of the Nat. Indian Health Bd.

Hal Stratton, Atty. Gen., Katherine Zinn, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Chief Justice.

The State's motion for rehearing having been granted, our opinion as follows shall be substituted for our original opinion filed on December 4, 1989.

Defendant-appellant, Robert Henderson, Jr., was convicted by a jury sitting in Ber-

nalillo County of first degree murder, criminal sexual penetration (CSP), kidnapping, aggravated burglary, and larceny. During the sentencing phase of trial, the jury gave Henderson the death penalty for first degree murder. In arriving at its sentence the jury found three aggravating circumstances: (1) murder of a witness, (2) murder during the commission of CSP, (3) murder during the commission of kidnapping. We find Henderson's attack on his convictions to be without merit. However, we reverse the sentence of death and remand to the trial court for a new sentencing determination on the first degree murder conviction.

FACTS

The victim was discovered by her son on July 18, 1986, lying dead and unclothed on the living room floor in her home. Upon entering the home, the victim's son noticed a smell of gas and saw that the back bedroom window had been broken out and that the bedroom was in a state of disarray. The victim was an eighty-nine year old widow known to have hired transients to do odd jobs around her house and to have taken transients into her home to feed them. The victim's son found only two items missing from his mother's home, a suitcase and a quilt.

Medical testimony established that the victim had received several blows to the head. Her ribs were fractured, presumably by someone pushing on her chest or crushing her. In addition, the victim had been strangled manually. Examination of the victim's vaginal area suggested forcible penetration, but no remains of sperm were discovered. The victim probably still was alive during the sexual assault and during the time when she sustained the rib fractures. Death resulted from a combination of strangulation and the blows to her chest.

After his arrest, Henderson told police that on the night of the murder he went to the victim's house at dark, looked into the house, heard sounds, and went around to knock on the front door. Henderson said that he had known the victim since 1977 and that they frequently had engaged in sexual intercourse. On the night in ques-

tion, Henderson stated that the victim let him in, prepared food for him, and then voluntarily had sexual intercourse with him. Henderson stated that the victim then had a seizure, and that he attempted to administer manual resuscitation, or "CPR." Henderson said he then carried her into the living room, falling as he did so. In the living room he again pressed on the victim's stomach and chest in order to revive her. When Henderson saw that the victim was dead, he said he panicked and tried to wipe any trace of his fingerprints from the scene. The next day he returned, entered by breaking out the back window, tried to wipe off more fingerprints, turned on the gas, and stole the suitcase with the quilt in it. At trial, Henderson testified that he had lied when he told police that he had a sexual relationship with the victim. When asked if he had raped the victim, he answered, "Yes," and when asked if he had beaten her, he answered, "Yes." At the same time, he maintained that he did not remember having committed those crimes and that he "must have" raped and beaten the victim during an alcoholic blackout. Henderson repeated that he had tried to administer CPR to the victim.

Henderson is a thirty-four year old Navajo Indian who first began drinking at age eleven. After his mother's death he lived in boarding schools around the country. By age twenty he was a chronic alcoholic, getting drunk nearly every day. Henderson became a drifter, unable to hold a job. When he could not afford liquor, he drank mouthwash, aftershave, or cleaning fluid to obtain alcohol. Medical testimony at trial established that Henderson was alcohol dependent and was required to use alcohol as self medication in order to function. After three days without alcohol Henderson could die. While incarcerated, Henderson required medication to prevent fatal alcohol withdrawal. Henderson was prone to blackouts, panic attacks, compulsive behavior, and rash impulses. During blackouts he still could walk around and talk, and it is possible that during a blackout period he could have committed the crimes for which he was convicted.

During voir dire, Henderson's counsel elicited responses from several prospective jurors concerning their attitudes toward parole of capital offenders sentenced to life imprisonment. One prospective juror, subsequently excused for cause, stated that convicts serving a life term usually get out in ten years and that was wrong. Another prospective juror said that a death penalty was more effective in deterring crime because some life felons get out in five or six years. This person stayed on the jury. Another prospective juror stated, "[L]ife imprisonment means ten years and they parole out. Is anybody kept in prison for life?" The court instructed this prospective juror, "[T]he only tools that you will have to answer the question * * * is [sic] the instructions that I give you. Those instructions will say that the sentence you are to consider is life in prison and death." This person sat on the jury.

One eventual alternate juror stated that perhaps the best thing to do is to put to death a life felon who would kill again. Another eventual alternate juror questioned whether a life felon could not be paroled and released. When the court instructed this person during voir dire that the only sentence she could consider would be life or death and asked her if she could follow the court's instructions, she answered, "I think so." Other prospective jurors on voir dire, who stayed neither as jurors nor alternates, likewise expressed reservations about the possibility that a life felon would be paroled.

During the penalty phase of trial, Henderson's counsel requested an instruction be given to the jury as follows:

> An inmate of [the state penitentiary] who was sentenced to life imprisonment as the result of the commission of a capital felony becomes eligible for a parole hearing after he has served thirty years of his sentence.

The court denied this requested instruction.

## ISSUES RAISED ON APPEAL

On appeal, Henderson raises twenty-two issues, the following of which we find to be dispositive. These issues may be phrased as follows:

(1) Did the trial court err in rejecting Henderson's proffered jury instruction to the effect that a person sentenced to life imprisonment would be eligible for parole in thirty years?

(2) Did the trial court err in allowing the jury to consider murder of a witness as an aggravating circumstance?

(3) Did the trial court err in allowing the jury to consider murder during the commission of a kidnapping as an aggravating circumstance?

(4) Did the trial court err in denying Henderson's motion to require the court to sentence him for his collateral noncapital convictions prior to the jury's deliberation on the sentence to be given him for the first-degree murder conviction?

We answer questions one and three in the affirmative, and question two in the negative. Our answer to question number four is rendered superfluous by our resolution of question number one, as shall be stated in our opinion herein. However, we conclude nonetheless that the option of prior sentencing on the noncapital offenses is a valid option available to a defendant who, in proper circumstances, requests such sentencing.

## I. HENDERSON'S REQUESTED INSTRUCTION ON PAROLE ELIGIBILITY

We base our decision herein on the fundamental fairness, due process and eighth amendment rationales implicit in the decision in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), to the effect that " 'the jury [must] have before it all possible relevant information about the individual defendant whose fate it must determine,' " *id.* at 1003, 103 S.Ct. at 3454 (quoting *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)), and in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), to the effect that states cannot limit the sentencer's consideration of any relevant circumstance that could "cause it to *decline to impose* the death sentence." *Id.*

at 304, 107 S.Ct. at 1773. Nothing in our decision in *State v. Clark*, 108 N.M. 288, 772 P.2d 322, *cert. denied,* — U.S. ——, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989), detracts from our belief that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) (quoting *California v. Ramos,* 463 U.S. at 998–99, 103 S.Ct. at 3452).

■ The requested instruction would have given the jury accurate information on what a life sentence actually means and would have served to correct misimpressions in some jurors' minds that a life sentence means "five or six" years or some other erroneously conceived period of time. In actuality, Henderson received fifty-one years and six months imprisonment on the other convictions, to be served consecutively to the death penalty. We cannot believe that, had the jury known ahead of time that a life sentence actually meant a minimum of twenty-five years and nine months (assuming all meritorious deductions), plus another thirty years before Henderson even would be eligible for parole, it would not have been more likely to impose a life sentence instead of a death sentence. This particular jury had members on it who thought that life meant as little as "five or six years." Such a jury was oriented impermissibly toward the death penalty even before it began its deliberations, and thus it was error for the court not to have restored a proper balance to the jury's orientation by instructing it according to the requested instruction.

## II. HENDERSON'S MOTION FOR PRIOR SENTENCING ON THE COLLATERAL NONCAPITAL OFFENSES

■ In *Clark*, we held that it is not error for the trial court to refuse to impose sentence for the noncapital offenses before the capital sentencing phase *if* the jury is instructed on the range of sentences available and if the jury is allowed to consider that range as a mitigating circumstance (always, at the defendant's request). We now hold that it *is* error to refuse an instruction such as the one considered in Point 1 above, pertaining to the meaning of a life sentence. We further hold that the court should, if requested, either impose sentence on the collateral noncapital offenses or give the range of sentences on those offenses as in *Clark*.

We conclude, however, that the better course of conduct for a trial court to follow would be first to sentence the defendant on the noncapital offenses if requested. Here, of course, Henderson has already been sentenced correctly and validly on his noncapital offenses. On remand, the court should simply inform the jury as to the sentences it earlier gave Henderson on his noncapital offenses. Further, the defendant is also entitled, at his request, to have an instruction read to the jury on parole eligibility following a life sentence, as discussed in Point I above.

To clarify further the distinction between *Clark* and our present opinion, in *Clark*, the defendant requested the court to sentence him on the collateral noncapital offenses before the jury deliberated on the capital offense. While the court denied this motion, it did present to the jury a stipulated instruction on the range of sentencing options available for the collateral offenses. Unlike the present case, Clark did not request an instruction on the meaning of a life sentence. Instead, Clark introduced "expert" testimony and argued this issue to the jury. The *Clark* majority concluded that, although such evidence and argument were improper and prejudicial, they amounted to invited and not fundamental error. 108 N.M. at 297–98, 772 P.2d at 331–332.

## III. THE AGGRAVATING CIRCUMSTANCES

Henderson asserts error in the trial court's allowing three aggravating circumstances to be considered by the jury in its deliberations on the death penalty. As provided in NMSA 1978, Section 31-20A-2 (Repl.Pamp.1987), aggravating circum-

stances are to be weighed against mitigating circumstances. What constitutes an aggravating circumstance is set forth in NMSA 1978, Section 31–20A–5 (Repl.Pamp. 1987). Subsections B and G, respectively, of Section 31–20A–5, provide that two of the aggravating circumstances to be considered by the sentencing court or jury are that, "the murder was committed with intent to kill in the commission of or attempt to commit kidnapping * * *; [and] the capital felony was murder of a witness to a crime or any person likely to become a witness to a crime, for the purpose of preventing report of the crime or testimony in any criminal proceeding * * *." Kidnapping is defined, in pertinent part, as "the unlawful taking, restraining or confining of a person, by force or deception, with intent that the victim * * * be held to service against the victim's will." NMSA 1978, § 30–4–1 (Repl.Pamp.1984).

█ In *Clark*, where we addressed this same issue, we noted that evidence was presented to the effect that Clark told others he had to kill his victim or it "would be the end for him." 108 N.M. at 304, 772 P.2d at 338. While the same degree of certainty does not exist in the case before us as to the separate motives behind Henderson's killing of his victim and his killing her *as a witness*, we nonetheless conclude that a plausible motive for the murder in this case was either a murder to silence a witness, or a murder to overcome the resistance of the rape victim. The lack of any other plausible motive, together with the acts of the defendant in attempting to avoid detection by destroying evidence at the scene that would tie him to the crime, convinces us that a jury could have reasonably inferred from the evidence that the murder was committed to prevent the victim from reporting the crime.

There is evidence in the record of a struggle by the victim. There is also evidence that immediately following the killing Henderson attempted to wipe his fingerprints from the scene. There is further evidence in the record that on the day following the murder Henderson returned to the scene, broke out a window to gain entrance, attempted once again to wipe the scene clean of any incriminating fingerprints, and turned on the gas jets in an effort to obliterate the entire crime scene. We believe that this evidence, along with other evidence in the record, was sufficient to establish the aggravating circumstance of murder of a witness.

The State has thus shown, insofar as this aggravating circumstance is concerned, why a more severe sentence should be imposed on Henderson compared to others found guilty of murder, as required by the holding in *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *See State v. Guzman*, 100 N.M. 756, 676 P.2d 1321, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984).[1]

The legislature has given us the responsibility to review death sentences on appeal and determine whether the evidence supports the jury's finding of a statutory aggravating circumstance. NMSA 1978,

---

1. The State argues that our decision on this issue is controlled by our holding in *State v. Guzman*, 100 N.M. 756, 676 P.2d 1321, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984). In that case we upheld a death sentence arrived at by a jury that considered and found the same three aggravating circumstances found by the jury here. In both the present case and *Guzman*, there was a single murder victim. In *Guzman*, however, the facts surrounding the murder are different than here.

In *Guzman*, there was a separate and distinct kidnapping, which took place a definite period of time before the murder occurred. The defendant in that case ordered his murder victim and her companion to drive him around in his car for some time before he forced them to get out. He then ordered one of the women to disrobe so that he could rape her. Thus the kidnapping already had been completed before the CSP and murder occurred.

Further, it is clearer in *Guzman* than in the present case that the defendant killed his victim in order to prevent him from becoming a witness against him. First, in *Guzman* there were two potential witnesses and thus twice the possibility that someone would report the defendant. Second, the murder victim's companion escaped, and the defendant chased her down and stabbed her repeatedly, leaving her for dead and without having raped her. This woman managed to survive. This pattern of conduct arguably makes it more certain that the defendant in *Guzman* wanted to kill his victims *in order* to prevent them from reporting him or testifying against him.

§ 31–20A–4(C)(1) (Repl.Pamp.1987). In assessing the death penalty we must apply that "greater degree of scrutiny" called for by the Constitution. *Ramos,* 463 U.S. at 999, 103 S.Ct. at 3452. In exercising that greater degree of scrutiny here, we conclude that the evidence as presented was sufficient to permit the jury to consider murder of a witness as an aggravating circumstance. On remand, the State may again present evidence on this question and the jury may again be permitted to consider murder of a witness as an aggravating circumstance, should the State once again carry its burden of proving this circumstance.

■ We reach a contrary conclusion, however, with respect to the aggravating circumstance of killing during the commission of a kidnapping. On oral argument on appeal, the State argued that one transaction can support proof of more than one crime. This is accurate. However, simply because there are sufficient elements present to prove more than one crime in the same transaction does not mean that more than one aggravating circumstance has been proven. While the same elements may be present in both instances, and here we do not find that this is the case, establishing the elements of an aggravating circumstance is not the same thing as establishing the elements of a crime.

Since the State made its case on kidnapping by arguing that in raping his victim Henderson simultaneously kidnapped her, the kidnapping and rape in this case, unlike the kidnapping and rape in *Guzman,* are inseparable. If we were to follow the State's reasoning, however, virtually every rape would be simultaneously a kidnapping, and while that may be true to establish elements of two different crimes in one transaction, such reasoning does not suffice to establish the statutory aggravating circumstance. It does not necessarily follow, simply because Henderson raped his victim and then killed her, that Henderson possessed the "intent to kill in the commission of ... kidnapping" as required by Section 31–20A–5(B). In *Guzman* it was obvious that the defendant intended to kill his kidnapped victim during the course of the kidnapping. Here, however, assuming *arguendo* that rape unequivocally means kidnapping, it is not clear to us that Henderson intended to kill his victim during the commission of a kidnapping. We find it more likely that he intended to kill the victim because she was a potential witness against him. We find, in other words, that the evidence as presented does not establish the statutory aggravating circumstance of killing in the commission of a kidnapping, and thus the trial court erred in allowing the jury to consider this aggravating circumstance. On remand, as we shall discuss below, the State is barred by double jeopardy considerations from once again presenting evidence on the aggravating circumstance of killing during the course of kidnapping.

■ The State asserts that a harmless-error rationale may be applied here, relying on *Clemons v. State,* 535 So.2d 1354, 1361–64 (Miss.1988), *cert. granted in part,* —— U.S. ——, 109 S.Ct. 3184, 105 L.Ed.2d 693 (1989), and *Pinkney v. State,* 538 So.2d 329, 355–57 (Miss.1988), *petition for cert. filed,* May 12, 1989. The State contends that when one of several aggravating circumstances is found invalid by a reviewing court, it is harmless error so long as one or more other aggravating circumstances properly have been considered by the jury. We now address the State's argument on this point.

The court in *Zant,* 462 U.S. at 884, 103 S.Ct. at 2746, held that, under Georgia's death penalty statute, invalidation of one aggravating circumstance did not invalidate automatically the sentencing proceeding. The Georgia sentencing statute is, however, unlike the New Mexico statute in that the use of statutory aggravating circumstances in Georgia is limited to the narrowing of the class of first degree murders to those that are capital offenses, subject to the death penalty. Thereafter, the jury does not consider the statutorily defined circumstances in deciding whether a particular individual should receive the death penalty. By contrast, New Mexico requires the jury to weigh aggravating and

mitigating circumstances in deciding whether to impose the death sentence. The *Zant* court carefully observed that it did "not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its [sentencing] discretion * * *." 462 U.S. at 890, 103 S.Ct. at 2749.

In *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), and *Wainwright v. Goode,* 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), however, the Court addressed the question it had avoided in *Zant.* Both of these cases dealt with the Florida statute, pursuant to which a judge had entered written findings of aggravating *and* mitigating circumstances before imposing the death sentence. Both cases also concerned a subsequent determination that one of the aggravating circumstances was invalid *under the state statute.* In *Barclay,* the Court approved the use of a harmless-error analysis when the trial court had found several aggravating factors but no mitigating factors; in *Goode,* the Court approved of independent reweighing of the findings by the appellate court when both aggravating and mitigating factors had been found by the trial judge.

These cases are distinguishable from the case before us. First, in New Mexico, while the jury does return special interrogatories on aggravating circumstances, it does not return special interrogatories that reveal whether it found any mitigating circumstances. Thus, it is not possible to tell on appeal whether any mitigating circumstances were found, or what weight they were given relative to the aggravating circumstances. While, in deciding some constitutional issues, this court does reweigh or balance facts found at trial, here we also would be required to reweigh the evidence itself.

Second, the challenges to the instructions in this case are *constitutional* challenges, not *statutory* challenges. In *Maynard v.* *Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the Court affirmed reversal of a death sentence under Oklahoma law, after one of the aggravating circumstances was determined to be unconstitutionally vague. Oklahoma, like New Mexico, requires the jury to weigh aggravating and mitigating circumstances in exercising its sentencing discretion. Writing for the Court, Justice White noted that Oklahoma appellate courts do not attempt to save a death penalty when an aggravating circumstance has been found invalid or unsupported by the evidence, and reasoned that the Tenth Circuit Court of Appeals "cannot be faulted for not itself undertaking what the state courts themselves refused to do." *Id.* at 365, 108 S.Ct. at 1860. The case was remanded to the Oklahoma appellate court for further proceedings under state law to determine the appropriate sentence.

*Maynard,* although affirming reversal of the sentence at issue, leaves unanswered whether, under a sentencing statute such as New Mexico's, a death sentence must be overturned when one of the aggravating circumstances is invalidated on constitutional grounds. As New Mexico courts do not ordinarily "reweigh" evidence on appeal, *cf. Goode,* 464 U.S. at 86–87, 104 S.Ct. at 383, (findings reweighed on appeal), we believe such a procedure to be particularly inappropriate as a means of "saving" a death sentence in light of our statutory duty to exercise special scrutiny of death sentence determinations. *See Guzman,* 100 N.M. at 761, 676 P.2d at 1326 (it is not this court's duty to retry sentencing phase for what may be a better result); *State v. Garcia,* 99 N.M. 771, 781, 664 P.2d 969, 979, *cert. denied,* 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); NMSA 1978, § 31–20A–4 (Repl.Pamp.1987). Under our statutory scheme, and because the record will not and does not reveal the basis of the jury's decision, we never could conclude beyond a reasonable doubt that, absent consideration of the invalid circumstance, the jury would have reached the same result.

In other words, in a state such as New Mexico where aggravating and mitigating

circumstances are weighed by the jury, when one or more of the aggravating circumstances is found to be invalid the entire death penalty sentence cannot be saved. The harmless error rationale put forth in *Clemons* and *Pinkney* would not be applicable to the specific statutory scheme in New Mexico where one cannot tell from the judgment of the jury what mitigating circumstances, if any, were found. This court has no reliable method of weighing the effect of the invalidity of one aggravating circumstance in the minds of the jurors without this information. Hence we reject the State's harmless-error argument.

The eighth amendment mandates that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (discussing the holding in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)).

Statutory aggravating circumstances serve to channel the jury's sentencing discretion in a manner that meaningfully distinguishes capital offenses in terms of the degree of culpability of the murderer. These circumstances must "reasonably justif[y] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. As it is the duty of this court under our death penalty statute to assure proportionality in sentencing, *see* Section 31–20A–4(C)(4), it is appropriate for us to inquire in this case whether instructing the jury on particular aggravating circumstances "genuinely narrow[ed] the class of persons" to those upon whom imposition of the death penalty was appropriate. *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. "[I]f a state wishes to authorize capital punishment it has a constitutional responsibility to tailor *and apply* its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 U.S. 420, 428, 100

S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980) (emphasis added).

▮ *Double jeopardy bars resubmission of aggravating circumstances as to which no substantial evidence was presented.* Finally, at a new sentencing hearing, the prosecution may not again submit instructions on the aggravating circumstance of murder committed in the course of a kidnapping. Our determination that this aggravating circumstance was submitted erroneously to the jury because of insufficient evidence raises double jeopardy consequences for the prosecution on remand.

In *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), the defendant's death sentence was overturned on appeal because insufficient evidence supported the aggravating circumstance of an especially heinous, cruel, or depraved killing. However, the trial court had refused to consider the circumstance of a murder for pecuniary gain because of an erroneous belief that this circumstance only applied in cases of murder-for-hire. The Supreme Court held that Double Jeopardy did not bar a new sentencing proceeding on the murder for pecuniary gain, but its holding implied that the new proceeding should be limited to this aggravating circumstance.

Writing for the majority, Justice White reasoned:

It is true that the sentencer must find *some* aggravating circumstance before the death penalty may be imposed, and that the sentencer's finding, albeit erroneous, that no aggravating circumstance is present is an "acquittal" barring a second death sentence proceeding.... [However, while the] defendant may argue on appeal that the evidence presented at his sentencing hearing was as a matter of law insufficient to support the aggravating circumstances on which his death sentence was based * * * the Double Jeopardy Clause does not require the reviewing court, if it sustains that claim, to ignore evidence in the record supporting another aggravating circumstance which the sentencer has erroneously rejected * * *. We hold, therefore, that

the trial judge's rejection of the "pecuniary gain" aggravating circumstance in this case was not an "acquittal" *of that circumstance* for double jeopardy purposes, and did not foreclose its consideration by the reviewing court * * * [nor] foreclose a second sentencing hearing * * *.

*Id.* at 156–57, 106 S.Ct. at 1755–56 (second emphasis added). *See also State v. Silhan,* 302 N.C. 223, 275 S.E.2d 450 (1981) (under North Carolina statute requiring jury to find and weigh statutory aggravating circumstances against mitigating circumstances in arriving at its decision whether to impose death penalty, State is proscribed from again presenting evidence of aggravating circumstances at new sentencing proceeding if: (1) insufficient evidence was presented at the preceding hearing; (2) the jury at the preceding hearing after considering evidence failed to find that circumstance existed; or (3) there would be other legal impediment such as felony-murder merger rule to its use, but state may rely at new death sentence proceeding on any aggravating circumstance as to which it offered sufficient evidence at hearing from which appeal taken); *see generally Arizona v. Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) (sentencer's finding, albeit erroneous, that no aggravating circumstance is present is an "acquittal" barring a second death sentence proceeding); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (double jeopardy bars prosecution from seeking second conviction when a reviewing court finds evidence insufficient to support judgment against defendant just as it does when there has been an acquittal by the trial court). *Cf. Zant v. Redd,* 249 Ga. 211, 290 S.E.2d 36 (1982), *cert. denied,* 463 U.S. 1213, 103 S.Ct. 3552, 77 L.Ed.2d 1398 (1983); *Brasfield v. State,* 600 S.W.2d 288 (Tex.Crim.App.1980) *overruled on other grounds, Janecka v. State,* 739 S.W.2d 813 (Tex.Crim.App.1987). *See generally,* Bennett, *Double Jeopardy and Capital Sentencing: The Trial and Error of the Trial Metaphor,* 19 N.M.L.Rev. 451 (1989).

As we specifically have held that the court erred in instructing the jury on the aggravating circumstance of murder during the commission of kidnapping, because the State failed to present substantial evidence on this circumstance, the State is precluded from again seeking to so instruct the jury.

To clarify, on remand the jury may consider the existence of two aggravating circumstances only. In other words, it is open to the jury on resentencing to determine, in addition to the alleged aggravated circumstance of killing during the commission of CSP, that the victim's murder was "murder of a witness to a crime," *provided* the State satisfies the jury beyond a reasonable doubt that the killing was committed during CSP and "for the purpose of preventing report of that crime." *See Clark,* 108 N.M. at 304, 772 P.2d at 338.

However, it shall not be open to the State to attempt to prove on remand that independent facts exist which support murder during the course of kidnapping. Finally, on remand, the new sentencing jury should be instructed that it need not unanimously find the existence of a mitigating circumstance before considering it. *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). We disapprove of any language in *Clark* to the contrary.

For all these reasons, we reverse the death sentence and remand this case to the trial court for a new sentencing hearing to be conducted in a manner that is not inconsistent with our conclusions above.

IT IS SO ORDERED.

BACA and WILSON, JJ., concur.

RANSOM and MONTGOMERY, JJ., Concur in part, Dissent in part.

RANSOM, Justice (concurring in part, dissenting in part).

I concur in the reversal of the sentence and in the remand for a new sentencing determination with instructions to the jury on the meaning of the alternative sentence of life imprisonment, and on the time the sentence would begin in relation to sentences to be served on collateral offenses.

However, in deference to "meaningful distinctions" necessary to achieve proportional sentencing among persons who receive the death penalty and those who do not, and for many of the reasons stated by Justice Montgomery in his partial dissent, I would limit the jury's consideration of aggravating circumstances to murder during the commission of criminal sexual penetration. I concur in all other aspects of the majority opinion except as follows:

*Intent is a false issue.* I do not agree with any inference that may be drawn from the majority opinion that Section 31–20A–5(B) requires proof of a specific intent for the aggravating circumstance of kidnapping. The majority refers to *Guzman,* in which "it was obvious that the defendant intended to kill his kidnapped victim during the course of the kidnapping," arguably attributing to the kidnapping a specific intent to commit the further act of murder. The majority then relies on a lack of evidence that Henderson "intended to kill his victim during the commission of a kidnapping." [1]

The requirement of specific criminal intent is distinguished from the requirement of general criminal intent by "defendant's intent to do some further act or achieve some additional consequence." *State v. Bender,* 91 N.M. 670, 671, 579 P.2d 796, 797 (1978) (quoting *People v. Hood,* 1 Cal.3d 444, 456, 462 P.2d 370, 378, 82 Cal. Rptr. 618, 626 (1969)). For example, a specific intent is required for a finding of the aggravating circumstance of murder of a witness *to prevent the report of a crime.* *See* § 31–20A–5(G). I do not believe a similar specific intent has been articulated by the legislature with respect to the felonies in Section 31–20A–5(B). There, the required intent is only a general criminal intent.

*Underlying facts and circumstances of kidnapping are not separate from criminal sexual penetration.* The rationale upon which I rely for finding a lack of evidence to support the aggravating circumstance of intent to kill in the commission of kidnapping was set forth in my specially concurring opinion to the original opinion, filed December 4, 1989. That "meaningful distinction" rationale has been adopted by the majority in the last two paragraphs of its Point III as an appropriate inquiry under this Court's duty to assure proportional sentencing.

From the perspective of proportionality, it was error to instruct on kidnapping as an aggravating circumstance. Each potential aggravating circumstance must point to separate underlying facts or circumstances in the transaction setting of the murder and must serve to distinguish the degree of culpability of the murderer under different murder scenarios.[2] The fact that the defendant in *Guzman initiated* the kidnapping well before and separately from his commission of another felony arguably suggests a degree of deliberation or otherwise distinguishes a transaction sequence that sets his crime apart from other cases of rape-and-murder.

Although our statute does not require the jury to attach any particular weight to aggravating circumstances, there may be a natural tendency to attach greater significance to a set of facts that supports two instructions than to one supporting only a single instruction. Channelling the jury's consideration to both criminal sexual penetration and kidnapping amounted to double counting. When instructions fail to sort out events and circumstances in a meaningful way, but instead direct the jury's attention twice to a single set of

---

1. It is noted that, because of identity of facts used to establish kidnapping and criminal sexual penetration, the majority by this reasoning should reach the same result as to both aggravating circumstances. The aggravating circumstances to be considered under Section 31–20A–5(B) may include *either* "intent to kill in the commission of * * * kidnapping * * * or* criminal sexual penetration." (Emphasis added.)

2. The problem encountered in this case with factual identity between two potential aggravating circumstances appears to be limited to kidnapping and CSP or kidnapping and certain instances of criminal sexual contact with a minor because, given the definition of kidnapping, virtually every case supporting one of the latter aggravating circumstances also would support charges of kidnapping.

events and circumstances as "aggravating," the result is an unacceptable risk that the jury will be oriented unreasonably towards choosing death over life imprisonment. Because the state failed to introduce evidence of sufficient separate facts to support an instruction on kidnapping as well as an instruction on criminal sexual penetration, it was error to submit both instructions to the jury.

*Length of incarceration is a mitigating factor.* Today, we reach a different result than reached by the majority in *State v. Clark*, 108 N.M. 288, 772 P.2d 322 (1989). While it is possible to draw facial distinctions between the two cases, I believe ultimately they cannot be harmonized because they take fundamentally irreconcilable stands on the relevance under the eighth amendment of "the sentencing prerogatives of the trial judge, or the possible length of a life sentence." *Clark*, 108 N.M. at 295, 772 P.2d at 329. It was on this point, of course, that this Court split in *Clark*, with the majority holding these issues to be irrelevant. *Compare id.* at 294, 772 P.2d at 328 ("We do not agree that the potential period of confinement of a capital defendant sentenced to life imprisonment is a mitigating circumstance under the eighth amendment jurisprudence of the United States Supreme Court.") *with id.* at 312, 772 P.2d at 346 (Sosa, C.J., specially concurring) ("The Supreme Court has held that consideration by the jury of a convicted capital felon's future dangerousness and the relationship of that dangerousness to the length of time he must serve in prison * * * is a proper subject for the jury's deliberation when it sits to decide whether the defendant should receive the death penalty. *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).") *and id.* at 316, 772 P.2d at 350 (Ransom, J. dissenting in part) ("*Lockett* and its progeny require that the defendant be allowed to place before the jury any relevant mitigating circumstance.

'States cannot limit the sentencer's consideration of any relevant mitigating circumstance that would cause it to decline to impose the [death] penalty.' *McCleskey v. Kemp*, 481 U.S. 279, 306 [107 S.Ct. 1756, 1774, 95 L.Ed.2d 262] (1987).").

Moreover, once it is acknowledged that the length of incarceration is relevant as mitigation under the eighth amendment, it cannot be maintained that the judge nevertheless retains discretion to choose whether to instruct the jury on the actual collateral sentence decided upon by the court or merely on the range of possible collateral sentences. There simply exists no acceptable reason to allow the introduction of added uncertainty and the concomitant possibility of jury error that may attend a complex instruction of the second sort. *See Eddings v. Oklahoma*, 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) (as much as humanly possible, death sentence determinations must not be based on whim, passion, prejudice, or mistake); *McCleskey*, 481 U.S. at 335, 107 S.Ct. at 1789 (Brennan, J. dissenting) (Supreme Court has demanded a uniquely high degree of rationality in imposing the death penalty).[3]

MONTGOMERY, Justice (concurring in part and dissenting in part).

I join in the opinion of the Chief Justice, except that I dissent from the ruling that there was sufficient evidence of the aggravating circumstance of murder of a witness to permit the jury to find and consider that circumstance at the sentencing hearing. I would vacate the sentence and remand for resentencing with instructions that, because of double jeopardy, the state may not resubmit the issues of murder of a witness and murder during the commission of a kidnapping as aggravating circumstances.

In the original opinion in this case filed December 4, 1989, the Chief Justice, Justice Ransom and I ruled that the answer to question (2)—"Did the trial court err in

---

**3.** Based on this same principle, I do not believe length of incarceration to be subject to proof by testimony, or documents, nor do I believe it to be the proper subject of attorney argument. To

this extent, I agree with the majority in *Clark*, and believe that portion of the *Clark* opinion is not contradicted by our decision today.

allowing the jury to consider murder of a witness as an aggravating circumstance?" —was in the affirmative. Now the Court rules that it is in the negative. In my opinion, nothing has been presented to warrant this change of position. While I fully respect the prerogative of any Justice to change his mind after the filing of a motion for rehearing, I observe that the state did not even draw into question, in its motion for rehearing, our original ruling on this issue. I believe that the disposition of the issue in the original opinion was correct, and I therefore disagree with the Court's reversal of its conclusion in the opinion on rehearing.

In the discussion of this issue in the original opinion, we first contrasted this case with *State v. Guzman*, 100 N.M. 756, 676 P.2d 1321, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984), in the same way as does the opinion on rehearing in footnote 1. We then said:

In the present case we have nothing like the certainty in the factual pattern that we had in *Guzman* to establish three separate and distinct aggravating circumstances. Here we simply have a murdered and raped victim. The State infers from the evidence that Henderson killed the victim in order to keep her from testifying against him. We cannot say, however, that the evidence conclusively establishes the separate and distinct aggravating circumstance of killing a witness.

Contrasting the present case with *State v. Clark*, 108 N.M. 288, 772 P.2d 322 (1989), we went on to note, as does the opinion on rehearing, that "[t]he same degree of certainty does not exist in the case before us as to the separate motives behind Henderson's killing of his victim and his killing her *as a witness*." (Emphasis in original.) The original opinion continued:

In other words, the State has not shown, insofar as this aggravating circumstance is concerned, why a more severe sentence should be imposed on Henderson compared to others found guilty of murder, as required by the holding in *Zant v. Stephens*, 462 U.S. 862, 877 [103 S.Ct.

2733, 2742, 77 L.Ed.2d 235] (1983). Here, for example, while the State may have shown that Henderson killed the victim and that the victim was a potential witness against him, the State has not shown necessarily that Henderson killed the victim "for the purpose of preventing report of the crime" as the statute requires. *See* § 31–20A–5(G). As we stated in *Clark*, "Many killings of kidnap victims, but by no means all, may be motivated by the desire to escape criminal prosecution." 108 N.M. at 305, 772 P.2d at 339.

Here, it seems to us that Henderson's intent to conceal his crime was more fully formed on the day after the murder, as shown by his return to the crime scene to wipe off fingerprints, turn on the gas, etc. Had he possessed the intention at the time of the victim's death to eliminate all traces of his presence from the scene of the crime, it seems more likely that he would have accomplished this on the same night when the victim died, rather than by returning to the scene to continue eradicating evidence of his presence.

The opinion on rehearing concludes that a "plausible" motive for the murder in this case was *either* to silence a witness *or* to overcome the resistance of the rape victim. Given the fact that we have upheld, as supported by sufficient evidence, submission to the jury of the aggravating circumstance of murder during the commission of CSP, I do not see how the Court can conclude that there was *also* sufficient evidence to find, beyond a reasonable doubt, that Henderson murdered the victim for the purpose of preventing her report of the crime. Conceivably, one or the other, but not both, of these aggravating circumstances could be submitted to the jury. The evidence convinces me, however, that the jury could reasonably find, beyond a reasonable doubt, that the victim was murdered during the commission of CSP; but in light of the considerations quoted above from the original opinion, and given the "greater degree of scrutiny" required in death-penalty assessments, I believe that there was insufficient evidence to permit

the jury to find that the victim was murdered for the purpose of preventing her report of the crime. *See State v. Williams,* 304 N.C. 394, 284 S.E.2d 437, 456 (1981) (evidence of post-killing attempts to avoid detection insufficient for inference that killing was motivated by desire to avoid arrest).