William Raymond MAYES, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–90–776.

Court of Criminal Appeals of Oklahoma.

June 24, 1994.

Order Denying Rehearing, Directing Issuance of Mandate and Correcting Opinion Aug. 4, 1994.

Certiorari Denied Feb. 27, 1995.

See 115 S.Ct. 1260.

Robert Prince, Lawton, Trial Counsel for appellant.

Melvin R. Singleterry, Dist. Atty., Nolan Hackler, Asst. Dist. Atty., Waurika, Trial Counsel for appellee.

Jamie D. Pybas, Asst. Appellate Public Defender, Norman, Appellate Counsel for appellant.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, Appellate Counsel for appellee.

*OPINION*

LUMPKIN, Presiding Judge:

Appellant William Raymond Mayes was tried by jury and convicted of Count I, Murder in the First Degree (21 O.S.Supp.1982, § 701.7(A)); and Count II, Conspiracy to commit Murder (21 O.S.1981, § 421), Case No. CRF–89–77, in the District Court of Jefferson County. The jury found the existence of one aggravating circumstance (the murder was especially heinous, atrocious or cruel (21 O.S.1981, § 701.12(4)) and recommended punishment of death for murder; and ten (10) years imprisonment and a $5,000 fine for Conspiracy to Commit Murder. The trial court sentenced accordingly.

For his first proposition of error, Appellant complains insufficient evidence existed to convict him for first degree murder. We address that issue in Section II.A., below. Briefly, the evidence reveals on November 19, 1987, the body of Phillip Trammell was found lying near the front door of his rural home near Waurika; he had been beaten, stabbed and shot. Appellant had begun an illicit sexual relationship with Margaret Trammell some time prior to the murder, and during the course of this relationship the two decided Margaret's husband, Phillip Trammell, should be killed for his sizeable insurance policy. Before the death, Appellant had told people Margaret Trammell promised him a new car and several thousand dollars if he would kill Phillip, or find someone who would. Several months after the murder, Appellant told others Phillip had been beaten with a baseball bat; it was not until after Appellant made those statements that authorities found a portion of a baseball bat handle mixed in with Phillip's clothing taken from the scene. Other evidence will be discussed below.

## I. ISSUES RELATING TO PRE-TRIAL PROCEEDINGS

### A.

■ Appellant in his eleventh assignment of error claims the trial court erred in denying him a change of venue. The record includes a number of newspaper articles about the murder, including one detailing victim Phillip Trammell's service to the community. There are also articles about Margaret Trammell's hearings, as well as articles which report a dissatisfaction among county residents and a resulting grand jury to investigate the lack of prosecution for several crimes, of which the murder was one.

██ However, mere publicity by itself does not establish Appellant did not receive a fair trial. The presumption is that a defendant can receive a fair trial within the county in which he is charged. A defendant must rebut this presumption by clear and convincing evidence not only that the jurors were exposed to pretrial publicity, but also that he was prejudiced by it as a result. *Tibbs v. State,* 819 P.2d 1372, 1377 (Okl.Cr.1991); *See also Bear v. State,* 762 P.2d 950, 953 (Okl.Cr. 1988); *Wilkett v. State,* 753 P.2d 383, 388 (Okl.Cr.1988); *Rojem v. State,* 753 P.2d 359, 365 (Okl.Cr.1988).

The trial court in announcing his decision clearly said he felt the defendant had not met this burden. However, he added that he would reconsider his decision "if the voir dire discloses a problem." We have reviewed the voir dire, and did not find the "influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings," *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

Additionally, we examined evidence for its use in the second test, which focuses on the entire circumstances surrounding Appellant's trial to determine whether Appellant received a "fundamentally fair" trial. *Id.* at 799, 95 S.Ct. at 2036. A review of the articles reveals mostly recitation of allegations by authorities that constituted the prosecution's case-in-chief at trial. Therefore, the articles were not harmful to the Appellant. Many dealt with Margaret's proceedings; and Appellant has presented us no evidence to indicate these interfered with his right to a fair trial, especially as Margaret was tried separately. Others refer to the efforts of local authorities in investigating the case. Simply because an article casts a local official in a favorable light does not necessarily mean Appellant is simultaneously cast in an unfavorable one.

██ Appellant also complains several people knew or knew of the victim or some witnesses. This Court has continually held "a fair jury does not necessarily require to-

tally uninformed jurors." *Brecheen v. State,* 835 P.2d 117, 120 (Okl.Cr.1992). As stated in *Hale v. State,* 750 P.2d 130, 134 (Okl.Cr. 1988):

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality and would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* (quoting *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961)). This concept of what constitutes a suitable juror was reaffirmed by this very same language in *Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2035–36.

We have reviewed the transcript of voir dire, and are satisfied those seated on the jury who had some knowledge of the case either formed no opinion based on what they had read or heard, or could set aside whatever vague impressions they had formed. This information was considered, *see Shelton v. State,* 793 P.2d 866, 870–71 (Okl.Cr.1990), along with the remainder of the circumstances surrounding the trial properly in the record before us, *see Bear,* 762 P.2d at 953; and we conclude Appellant "has failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice." *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2038.

### B.1.

██ Appellant next complains errors occurred during voir dire which violated his

right to a fair trial. He first complains the trial court asked a confusing question to the jurors to determine whether they could impose the death penalty. The record shows the trial court asked "[i]n a case where the law and evidence warrant, in a proper case, could you without doing violence to your conscience, consider a verdict imposing the death penalty?"

This Court has repeatedly held this question is improper, as it tends to be confusing. Although we have affirmed cases in which it was used in the past, we have also found that violence done to one's conscience is not the point of the *Witherspoon* voir dire examination. · *Duvall v. State*, 825 P.2d 621, 630 (Okl.Cr.1991). The only legitimate concern being whether each jury member will consider the imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment. *Id.* To make this clear to a prospective juror, we modified OUJI–CR 104.9 Alternate 2 to read as follows:

"If selected as a juror, and you find that the law and evidence in this case warrants the recommendation of the death penalty, could you vote to recommend that penalty?"

*Id.* The proper inquiry is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Banks v. State*, 701 P.2d 418, 422 (Okl.Cr. 1985). However, this error does not automatically necessitate reversal. *Id.* This Court will not reverse based on an error of the trial court unless that error has resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. 20 O.S.1991, § 3001.1.

Appellant complains of two instances here. In each instance, the judge asked the above question. After venireperson Hutcheson said she could not impose the penalty, the court asked:

Are you—or let me simply ask it this way. If you found beyond a reasonable doubt that the Defendant was guilty of murder in the first degree, and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts and the circumstances of the case, you would not consider inflicting—

BY JUROR HUTCHESON: Yes, sir.

BY THE COURT: —the death penalty?

BY JUROR HUTCHESON: Yes, sir.

BY THE COURT: So you're indicating to me under no circumstances could you even consider inflicting the death penalty. Is that correct?

BY JUROR HUTCHESON: That's right.

BY THE COURT: All right. I'm sorry, Miss Hutcheson, but at this point you are excused from further service on the case.

(Tr. 98–99). Under the circumstances and questions asked by the court as follow-up questions, no reversible error occurred. In addition, defense counsel did not object, as it became clear the venireperson could not inflict the death penalty under any circumstances.

The same is true of venireperson Hagood, whose answers paralleled those of Ms. Hutcheson. The Court then asked:

Okay. Let me ask you the second question, and you need to listen to the phrasing, because it is somewhat different. If you found beyond a reasonable doubt that the Defendant was guilty of murder in the first degree—

BY JUROR HAGOOD: Uh-huh.

BY THE COURT: —and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations against the death penalty such that, regardless of the law, the facts and the circumstances of the case, you would not consider inflicting the death penalty?

BY JUROR HAGOOD: No, sir.

BY THE COURT: All right. You're saying that you cannot even consider it as a viable punishment. Is that right?

BY JUROR HAGOOD: I don't believe I could, honestly.

BY THE COURT: All right. You're excused, Miss Hagood. Thank you.

(Tr. 104–05). Again, under the circumstances, especially in the absence of an objection, there is no error necessitating reversal.

### B.2.

■ Appellant next complains the court erred in restricting his voir dire. The transcript reflects that defense counsel asked panel members whether they thought police officers should be more professional than the average witness in their courtroom presentation because of their training and experience; and whether "their observations are necessarily any better than yours or any other person for that matter?" The court at a subsequent bench conference observed the questions were hypothetical, and therefore improper. This observation and admonishment to counsel was repeated once, later during voir dire when defense counsel asked a panel member if he would judge the credibility of the witnesses even if they were convicted felons or police officers.

Rule Six of the Rules of the District Courts provides:

> The judge shall initiate the voir dire examination of jurors by identifying the parties and their respective counsel. He may outline the nature of the case, the issues of fact and law to be tried, and may then put to the jurors any questions regarding their qualifications to serve as jurors in the cause on trial. The parties or their attorneys shall be allowed a reasonable opportunity to supplement such examination. Counsel shall scrupulously guard against injecting any argument in their voir dire examination and shall refrain from asking a juror how he would decide hypothetical questions involving law or facts. Counsel shall avoid repetition, shall not call jurors by their first names or indulge in other familiarities with individual jurors, and shall be fair to the court and opposing counsel.

Title 12 O.S.1981, Ch. 2, App., Rule 6. This Court has held Rule Six applies equally to civil and criminal proceedings. *Strube v. State*, 739 P.2d 1013, 1015 (Okl.Cr.1987). The manner and extent of examination of jurors cannot be prescribed by any definite, unyielding rule, but rests in the sound discretion of the trial judge. *Id.*

■ We have also held, however, there are countervailing principles which are applicable. First, Rule Six requires both the State and the defense be given "reasonable opportunity to supplement" the court's examination of jurors. We have held this rule makes it clear participation by both the State and the defense in voir dire, at least in criminal proceedings, is a right. *Id.* at 1016.

However, that right is not unlimited. The purpose of voir dire examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. *Id.; Phillips v. State*, 650 P.2d 910, 914 (Okl.Cr.1982). While we may not agree with the trial court these questions were hypothetical in the sense this Court has interpreted them, *see Lovell v. State*, 455 P.2d 735, 737–38 (Okl.Cr.1969); *Broyles v. State*, 83 Okl.Cr. 83, 92–93, 173 P.2d 235 (1946), neither can we say the two instances of limiting these particular questions restricted Appellant in his ability to determine whether there were grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. We see no error which so deprived Appellant of a substantial right that a new trial must be held.

### C.

■ In his thirteenth proposition of error, Appellant claims reversal is warranted because the trial court refused individual voir dire of the venire panel members and refused to sequester the jurors during trial. He acknowledges this Court has held individual voir dire is not a right, but rather has been held to be appropriate in certain situations. *Cannon v. State*, 827 P.2d 1339, 1341 (Okl.Cr.1992). However, he claims the per-

vasiveness of pretrial publicity made it necessary here. The burden of proof is on Appellant to show the trial court abused its discretion by not conducting individual voir dire. *Brown v. State*, 743 P.2d 133, 137 (Okl.Cr. 1987).

He likewise acknowledges the question whether to sequester jurors during trial is within the discretion of the court. *Harvell v. State*, 742 P.2d 1138, 1141–42 (Okl.Cr.1987). An abuse of discretion will only be found where the appellant shows, by clear and convincing evidence, (1) the jurors were specifically exposed to media reports which (2) were prejudicial to the appellant. *Id.; Collums v. State*, 695 P.2d 872, 875 (Okl.Cr. 1985). The appellant offers this Court no evidence, much less clear and convincing evidence, the jurors were exposed to media reports during trial, nor does the record reflect that the appellant was prejudiced by the failure to sequester the jury. To the contrary, the trial court took pains to admonish the jury before each recess and at the end of every session. This assignment of error is without merit.

### D.

■ In his fifteenth proposition of error, Appellant asserts his case should be reversed because the prosecution did not provide actual notice the death penalty would be sought until four days before trial.

Appellant's trial began on May 7, 1990. The record shows the prosecution filed a Bill of Particulars on April 25, 1990, and mailed a copy to Appellant's attorney the same day; however, the notice was returned by the post office. When this was discovered, a member of the prosecutor's office hand-delivered a copy of the Bill of Particulars on May 3, 1990.

Were this the only evidence before us, Appellant's argument would have more weight. However, the record clearly shows Appellant was apprised of the prosecution's intention long before that. At Appellant's

initial appearance on November 17, 1989, the minute reflects the prosecution's intention to seek the death penalty. The minute also reflects Appellant's acknowledgement he knew a Bill of Particulars would be filed (O.R. 3). The record also shows Appellant's attorney on April 19, 1990 filed a Motion to Dismiss the Bill, in which he showed he was aware the prosecution alleged the two aggravating circumstances of especially heinous, atrocious or cruel, and continuing threat (O.R. 203). He also filed a motion to list witnesses to be used in the punishment stage (O.R. 201). In addition, a conference before trial began clearly shows Appellant had been previously informed of the prosecution's intention to seek the death penalty. And although his. attorney's notice was sent back, Appellant's copy of the notice was hand-delivered to him the day it was filed.

■ Title 21 O.S.1981, § 701.10, provides that during the penalty phase of trial only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. This statute, together with Okla. Const. art. II, Sec. 20, contemplates a defendant in a murder case must be given a summary of the evidence intended to support the alleged aggravating circumstances, and a list of witnesses the State might call. *Williamson v. State*, 812 P.2d 384, 408 (Okl.Cr.1991); *Walker v. State*, 723 P.2d 273, 285 (Okl.Cr.1986), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). The purpose of notice prior to trial is to allow the defendant time to present a defense or an explanation for alleged criminal misconduct. *Williamson; Johnson v. State*, 665 P.2d 815, 823 (Okl.Cr.1982).

In *Wilson v. State*, 756 P.2d 1240, 1245 fn. 1 (Okl.Cr.1988), we held the State is not required to give a detailed description of the evidence that will be offered in order to meet the statutory notice of Section 701.10. Under these circumstances, Appellant had sufficient notice of the content of the bill of particulars.[1]

■ Appellant's counsel also acknowledged he had received a list of witnesses.

---

1. We note this rule has been modified somewhat

by *Hunter v. State*, 829 P.2d 64 (Okl.Cr.1992),

The real problem urged before trial started was his unfamiliarity with the witnesses who had been listed after he had received his initial list. He requested a delay to investigate these new witnesses. The trial court refused, commenting "the Court will consider as we go along the possibility of letting you talk with these particular witnesses that were not endorsed, if there is some sort of surprise claimed." The defendant then announced ready for trial. He did not interpose any objections at the time the witnesses were called to testify, nor did he at any time renew his request for a continuance at the time the witnesses were called.

Appellant has waived consideration of this allegation except for fundamental error review by his failure to object during trial. The failure to object to lack of notice, either at a pre-trial hearing or at the time the challenged evidence is offered will result in a waiver of his statutory right. *Williamson v. State,* 812 P.2d 384, 408 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); *Green v. State,* 713 P.2d 1032, 1038 (Okl.Cr.1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986).

Additionally, even if an objection is lodged and overruled, the rule as repeatedly announced by this Court is that a defendant "must do more than simply object; he must withdraw his announcement of ready for trial and request a continuance." *Diaz v. State,* 728 P.2d 503, 513 (Okl.Cr.1986); *Mason v. State,* 560 P.2d 1048, 1050 (Okl.Cr.1977). *See Fisher v. State,* 668 P.2d 1152, 1155 (Okl.Cr. 1983). Therefore, we review for fundamental error only.

We have reviewed the list of witnesses endorsed after Appellant received his list; of the 17 listed, only four [2] were called.

■ Robert Puckett, a Wichita Falls real estate broker who handles rental property, testified he executed a rental agreement for apartment 19, Capri Apartments, to Billy Ray Johnson. The rent started December 17, 1987, and Appellant paid one month's rent and deposit. He did not remember whether Appellant was alone when he rented the apartment; nor did he know if the apartment was ever occupied, although he did remember some clothes were picked up at the end of the term. Appellant himself testified he rented the apartment, adding he received the money from Margaret. We find no fundamental error here.

William H. Pewitt testified he was a volunteer emergency medical technician who responded to the Trammell house on November 19. He examined the body and found no pulse, and later took the body to the hospital, then to the medical examiner's office in Oklahoma City. He testified the body exhibited some lividity when he first observed it, but testified he could not tell how long the victim had been dead. Rigor had begun when he removed the body at approximately 9:30 p.m. In light of the medical examiner's testimony estimating the time of death which essentially parallels Pewitt's observations, there is no fundamental error in allowing his testimony.

■ Hank Anderson testified he is an attorney who was involved in the civil suit between Margaret Trammell and her children over insurance proceeds. His testimo-

---

where this Court held a Bill of Particulars must be filed at or before arraignment. Appellant was arraigned on March 6, 1990. However, we decline to accept Appellant's invitation to apply this provision to his case, which was tried approximately two years before *Hunter* was handed down.

**2.** We base the number of witnesses in this category on the attorney's statement to the court, who had asked him what witnesses recently endorsed he had no knowledge of. Mr. Prince stated he was not aware of the substance to be given by "Mary Anderson" (Tr. 12). In repeating

the list, the court stated "Hank Anderson" instead of "Mary Anderson." (Tr. 13), who was endorsed at the same time (O.R. 274). From this and a reading of the transcript as a whole, it is evident Mr. Prince was aware of Hank Anderson's role as attorney for the children in a civil lawsuit (Tr. 1202). Based on these statements, we therefore feel failure to give additional notice concerning the actual listing of Hank Anderson's expected testimony did not rise to the level of fundamental error, for reasons given in the body of the opinion.

ny is discussed in greater detail below. Essentially, he testified Margaret settled a lawsuit over the proceeds and estate, and she received twenty percent of those proceeds. He was not even aware Appellant was connected with the settlement until the morning he was called to testify in Appellant's murder trial. Outside of talk he heard, he had no indication Appellant received any of the proceeds, nor was Appellant a part of the order disbursing the funds. Accordingly, we find no fundamental error in the admission of this evidence.

That leaves only the testimony of Don Allen, Jr. Allen, a fellow inmate in the Jefferson County jail, testified Appellant told him he and Margaret were having an affair. Appellant said Margaret loved him, although he did not love her; if he were to marry her, he could have half of the insurance policy proceeds. Appellant commented if she talked to authorities, he would see she went down as quickly as he did, because she was just as guilty.

■ That evidence was introduced in one form or another by other witnesses. The part on which we must focus for purposes of this proposition is Allen's testimony Appellant seemed concerned about a gun authorities had seized from the Trammell home, asking Allen "if the laws could tell if a gun had been fired if it had been cleaned real good. Taken apart and cleaned" after it had been fired. He also asked Allen if authorities had the ability to retrieve a weapon, such as a hammer or cue stick, which had been thrown in a pond or lake.

This evidence, while it goes to Appellant's guilt or innocence, does not in any way affect the aggravating circumstances or mitigating evidence offered during the second stage of his trial. Therefore, even if we find its introduction violated 21 O.S.Supp.1989, § 701.10, we find its effect on the second stage of the proceedings to be harmless.

■ There was no violation as the evidence pertains to the first stage of the proceeding. Okla. Const. art. II, Sec. 20 provides in relevant part:

In all criminal prosecutions the accused ... shall have the right to be heard by himself and counsel; and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their postoffice addresses.

Appellant admits that here, the evidence was given to counsel four days before trial started. The constitutional provision is satisfied. Therefore, even if the evidence were inadmissible against Appellant in the second stage, its admission was harmless beyond a reasonable doubt. It was admissible in the first stage. Cf. Wilson v. State, 756 P.2d 1240, 1246 (Okl.Cr.1988) (evidence admitted in both stages, while inadmissible in second stage [where it could have influenced the sentence, and therefore sentence modified], did not affect guilt or innocence of Appellant).

We find no merit to this proposition.

## II. ISSUES RELATING TO TRIAL PROCEEDINGS

### A.

■ Appellant's first proposition of error is based on a claim of insufficiency of the evidence. Before reviewing that evidence, we must first determine the appropriate standard of review. This Court has held that when the evidence against Appellant is wholly circumstantial, as Appellant here claims, the State's evidence must exclude every reasonable hypothesis other than guilt. Greer v. State, 763 P.2d 106, 107 (Okl.Cr.1988).

■ There is no question the case presented by the prosecution contained entirely circumstantial evidence. That can best be shown by quoting this Court's definition of *direct* evidence:

Direct evidence is that which points immediately to the question at issue, and which, if believed, proves the existence of the fact in issue without inference or presumption.

It is evidence obtained by means of any one of the senses, and includes testimony by a witness of his own knowledge of the main fact or facts to be proved. Testimony that accused [sic] admitted having committed the offense is of the nature of direct evidence of his guilt.

*Nichols v. State,* 418 P.2d 77, 84 (Okl.Cr. 1966) (emphasis in original omitted). Here, all evidence presented by the prosecution consisted of evidence from which the central point at issue, *i.e.,* who killed Phillip Trammell, must be inferred.

That does not resolve the issue, however, because there was direct evidence in Appellant's case-in-chief, presented in the form of testimony by Appellant. The existence of this evidence forces us to re-examine the *Greer* line of cases, which seem to imply only direct evidence presented during the State's case-in-chief can be used to determine whether this Court reviews a sufficiency of the evidence claim as one containing only circumstantial or one containing both circumstantial and direct evidence. We hold there is *no* prohibition against using direct evidence presented in the defendant's case to determine which standard of review is appropriate. We do this based on analogy to other procedural instances at trial and by examination of the line of cases dealing with circumstantial evidence.

We begin our analysis with an analogy to a demurrer to the evidence at the close of the prosecution's case. In *Smith v. State,* 509 P.2d 1391 (1973), this Court examined a case where it assumed evidence was insufficient when the State rested, but became stronger after cross-examination of the defendant's witnesses and resulting rebuttal testimony. This Court overruled other cases which had held evidence presented following a demurrer could have no bearing on the question of sufficiency of the evidence, observing that "[b]y introducing evidence in his own behalf, [a] defendant takes the risk of completing a case against himself." *Id.* at 1397 (quoting *United States v. Kenny,* 236 F.2d 128, 131 (3d Cir.1956)), adding:

This may sometimes present the defendant with a hard choice, but that is true in many situations which may confront litigants in the course of almost every trial, and provides no basis for exempting the defendant from the provisions of the rule.... If defendant believes his motion is well taken, he should stand upon it.

*Id.* (quoting *State v. Portrey,* 6 Wash.App. 380, 492 P.2d 1050, 1053 (1972)). *Cf. Maxwell v. State,* 742 P.2d 1165, 1169 (Okl.Cr. 1987) (accomplice testimony can be corroborated by evidence presented by the defendant as well as by the State).

The same basic proposition is true here. When he testified in his own behalf, Appellant ran the risk he would present damning evidence on cross-examination. In taking the stand, Appellant presented evidence which, if believed, would have resolved the issue in his favor.

In addition, the argument the standard of evidentiary review should be determined by the evidence presented in the State's case finds no support in our previous caselaw. We have traced the line of cases leading to *Greer,* and arrived at unsupported dicta in *Gray v. State,* 561 P.2d 83 (Okl.Cr.1977). There, appellants argued this Court should examine evidence they presented, pointing out their version of events was as plausible as the State's version. This Court commented, without authority, that it was the State's evidence that should be considered; and any conflict between the State's and the defendants' evidence was to be resolved by the jury. *Id.* at 87. That idea of using solely the prosecution's evidence is in direct conflict with this Court's earlier pronouncement in *Lowrey v. State,* 87 Okl.Cr. 313, 197 P.2d 637 (1948), where appellant on appeal contended, as does Appellant here, that all the evidence against him was circumstantial. This Court responded:

The defendant's position that the case is entirely circumstantial is erroneous. Here the state's case is circumstantial, while the defendant's case is dependent upon his own testimony. He alone was present at

the killing of the victim. He alone knew what took place. He testified to what is supposed to be the facts, but because of the inconsistency of his stories as to his condition at the tragedy, his defense could be viewed as wholly unreliable. But we repeat, the case as far as the defendant is concerned is not circumstantial. It is based upon what the accused swears to positively.

[The Court then reviewed applicable case law]

.... With reference to [the rule requiring the facts proven to exclude every reasonable hypothesis other than the guilt of the defendant], if the defendant's story is true there is no need for applying them, and he should be exonerated. If it is false then the circumstantial evidence is not consistent with innocence and may be viewed as excluding every reasonable hypothesis other than guilt. Therefore, the evidence is sufficient upon which the jury may have predicated a verdict of either innocence or guilt.

*Lowrey,* 197 P.2d at 644–45. This rejects the idea only one side's evidence must be reviewed to determine the proper standard of review. As this requirement has no support in this Court's earlier jurisprudence on the subject, to that extent, *Greer* and *Gray* are overruled.

▮ Therefore, since this case presents both direct and circumstantial evidence, we will review it in the light most favorable to the State to determine whether any rational trier of fact could find the elements of the crime charged beyond a reasonable doubt. *Spuehler v. State,* 709 P.2d 202, 203–04 (Okl. Cr.1985). We find, viewed in the light most favorable to the prosecution, the evidence is sufficient.

Authorities first became aware of the death of Phillip Trammell at approximately 3:30 p.m. on November 19, 1987, after Margaret Trammell telephoned them. Authorities found the body lying in a pool of blood just behind the closed front door. The body was blocking the door; although blood on the glass storm door indicated Mr. Trammell first fell bleeding to the floor while the front door was opened. Smears in the blood and a torn belt loop led authorities to believe the 275–pound man had been dragged back a few inches so the front door could be closed. The body was so bloody and beaten authorities were initially unsure by what means death was effected. Based on blood marking on the victim's shirt and the floor, authorities believed he was first lying on his back, then at some point rolled onto his right side. There was no evidence of forced entry into the home.

The victim worked the midnight–to–8:30 a.m. shift at a Wichita Falls post office. He was also an official in the local postal workers union, and apparently had some difficulty with some union members. He was last seen by his mother, who lived a few hundred yards from his home and located approximately four miles south of Waurika along highway 81. Phillip and his mother had gone out to feed cattle. They returned at approximately 11:30 a.m.. She was "pretty sure" she saw all the Trammell cars at the house at 11:31 a.m., when she glanced at her clock after going inside. It was Phillip's habit to have a bowl of cereal, take his medicine for arthritis, then go to bed. Authorities found a bowl of cereal filled with milk at the kitchen table. They also found his medication lying on the table.

The autopsy revealed the victim had been beaten with a blunt object, stabbed five times, and shot with a shotgun; although not necessarily in that order. The medical examiner testified it appeared the victim received several blows to the front portion of the head; then blows to the rear of the head, where lack of bruising indicated they could have been inflicted some period of time later, while the victim was in shock or near death. The medical examiner testified the time of death could have been between 11:30 a.m. and 2:45 p.m.. The EMT at the scene testified he checked the body for a pulse at approximately 3:30 p.m.. When he loaded the body between 9:30 and 10 p.m., rigor had begun; and the body exhibited substantially

more lividity, and was colder than it had been six hours earlier. The number and size of shotgun pellets in the body led authorities to believe the victim had been shot with his own .410 shotgun.

The house was described as generally very dirty and dusty. However, authorities in the bedroom found a .410 shotgun recently cleaned and oiled. The gun was leaning on the wall next to a .22 rifle, which was as dusty as the rest of the house. Authorities did not immediately seize the shotgun, waiting until December to do so. At the time it was seized, the shotgun was not as oily as it had been; testimony indicated the layer of oil on a freshly cleaned gun will dissipate over time. The victim's son recalled the victim had not shot the gun since June 1987.

Appellant had worked with Margaret, the victim's wife, at a Waurika nursing home; but quit after rumors began circulating of their affair and other indiscretions by Appellant. Appellant at trial admitted he and Margaret had a sexual relationship; he had denied this in earlier statements to authorities.

Before Phillip Trammell's death, Appellant told several people he was having an affair with Margaret Trammell. Before the homicide, Appellant made comments about sharpening knives he always carried. Appellant commented he had to have the knives sharp, because he would have to use them for something. He also commented he was doing a big favor for Margaret, adding he would receive a lot of money for the favor. Appellant was not seen carrying the knives after Phillip Trammell's death. He gave various stories to different people, saying he had traded one for some marijuana, or had lost one while jogging. He gave one knife to his uncle to keep for him; it was later analyzed and had no traces of blood on it. The second one was never recovered.

On one occasion before the murder, Appellant had interrupted a conversation about games, saying he was playing a ten-thousand-dollar game. Appellant had told other people he was to receive a Corvette and a large sum of money from Margaret, who was supposed to be coming into a large sum of money. Phillip Trammell had a life insurance policy valued at $225,000. Appellant told one acquaintance about the promise of a car and money, adding that accidents could happen and his "sugar mamma" would take care of him, referring to Margaret. Appellant told his uncle Margaret had asked him to kill Phillip for her; if he did, she would buy him a new car, probably a Corvette, and give him $10,000. He later denied having anything to do with the killing.

After the murder, Appellant purchased a 1979 Chevrolet Camaro with money he said Margaret gave to him. He also said Margaret had rented him an apartment in Wichita Falls; however, he moved in with Margaret approximately ten days after the murder and stayed there until he was arrested on nonrelated charges on New Year's Eve.

While in jail on the other charges, he told authorities conflicting stories about his relationship with Margaret. On one occasion, Appellant attempted to get Deems Rowell, a fellow jail inmate who was being released, to deliver a letter to Margaret. The letter was confiscated. In it, Appellant told her (among other things) to "please watch your step where you go and what you say." Appellant told the same inmate he was concerned Margaret would get nervous and say something to incriminate him. He said he had an "alibi" for the time of the murder; it appeared to the inmate Appellant was using him as a sounding board for his alibi theory.

Appellant told another inmate, Don Allen, Jr., he and Margaret were having an affair. Appellant said Margaret loved him, although he did not love her; if he were to marry her, he could have half of the insurance policy proceeds. Appellant commented if she talked to authorities, he would see she went down as quickly as he did, because she was just as guilty. Appellant seemed concerned about a gun authorities had seized from the Trammell home, asking Allen "if the laws could tell if a gun had been fired if it had been cleaned real good. Taken apart and

cleaned" after it had been fired. He also asked Allen if authorities had the ability to retrieve a weapon, such as a hammer or cue stick, which had been thrown in a pond or lake.

Margaret Trammel moved to Chickasha in June 1988. Some time after that move, Phillip's children cleaned out the house south of Waurika. In a closet, partially hidden under other articles, was a gun cleaning kit. Phillip's daughter, Patty, thought it strange the gun cleaning kit was not as dusty as its surroundings. The kit was taken out of the closet and eventually to her house. It was turned over to authorities in January 1990, after Appellant's preliminary hearing. A fingerprint examination revealed Appellant's thumbprint on the cardboard cover of the kit; and the victim's fingerprint on a solvent bottle inside the kit.

After Margaret moved to Chickasha in June 1988, she and her son Eric traveled to Alabama, where they picked up Appellant after he was released from custody there. Appellant moved in with them, where he stayed until he married someone else in August 1988. After the marriage, he continued to see Margaret nearly every day. He left his new wife and moved in with a third woman in November 1988. Around this time, he told both this woman and the woman's aunt Phillip Trammell was killed by a baseball bat.

An Oklahoma State Bureau of Investigation lab technician was examining articles of Phillip Trammell's clothing at the request of Appellant's attorney on March 16, 1990. When she opened the bag and dumped out the clothing, out fell a piece of wood that appeared to be off the handle of a baseball bat. Before that, authorities had been unaware a baseball bat had been used to beat the victim.

In his brief, Appellant virtually ignores this evidence, focusing instead on time frames he claims prove he could not have committed the murder. Evidence indicates Appellant was first seen on November 19 at approximately 8:40 a.m., standing by Margaret's car near the gasoline pumps at the Quick Mart in Waurika.[3] He was next seen from approximately 11:30 a.m. until near 12:30 p.m. at Stick's Quick Mart in Ryan, approximately five and one-half miles south of the Trammell residence. Appellant was seen during this time without a shirt on. He played pool and other games in the Quick Mart. However, it seems clear appellant left Stick's with Margaret, who was seen in the store between 11:00 a.m. and noon. Margaret was also seen at 11:30 a.m. by her hairdresser, when she stuck her head in the shop to change her appointment time. She commented at that time she had to return to the house to turn off a coffee pot.

Margaret was next seen at the Wichita Falls Postal Credit Union at approximately 1:20 p.m. It is 49 miles from Stick's in Ryan to Wichita Falls; at 55 miles per hour, authorities reported it took 58 minutes to get there. Workers at the credit union saw a man matching Appellant's description in Margaret's car as it pulled up. At the credit union, Margaret demanded a $700 loan, saying she needed the money to go Christmas shopping. She was unable to get the requested amount without Phillip's signature, but was offered approximately $250, which she took. The check was made to the order of Phillip Trammell at 1:49 p.m., and Margaret left shortly after receiving it. Employees reported Margaret appeared nervous.

Appellant testified Margaret took him directly to Waurika from Wichita Falls; however, one witness said otherwise. Lucille Lawson lived in Ryan and worked at a convenience store in Waurika. Her shift was to

---

**3.** In his reply brief, Appellant points out Margaret's car used diesel, and there was no diesel at the Waurika Quick Mart. We are not influenced by this evidence. The testimony of the witness who saw Appellant there did not specifically state Appellant was pumping gasoline into the fuel tank; he was merely standing there. Further-

more, even if he were pumping gasoline, this is not dispositive of the issue. Margaret's son testified that, although Margaret's Rabbit used diesel, there was another Rabbit at the house which ran on gasoline. There is nothing in the evidence before us precluding that car's possible use.

start at 3 p.m., and she was expected at the store by 2:45 p.m. On November 19, she was riding with a co-worker up highway 81 and approached the Trammell house between 2:35 and 2:40 p.m. Lawson, who described herself as a very cautious driver and a good backseat driver, saw a little white car pulling out of the Trammell driveway. Fearing the car would not stop, she warned the driver, and continued to watch the little car as she passed by it. At that time, she recognized Appellant as the driver; she did not recognize the female passenger, but described her as a bleachy-blonde. Margaret had bleached blonde hair. Margaret drove a white Volkswagen Rabbit; the victim drove a white Volkswagen Golf.

Appellant appeared at a friend's house between 2:30 and 3 p.m. on November 19. He commented he would not keep company with married women any more. Appellant had his uncle take him to a convenience store to make a telephone call on November 20, the day after the murder and the day Appellant was questioned by authorities. Appellant told his uncle he needed to call Margaret so they could get their stories straight.

 Appellant claims it is impossible to kill Phillip, clean a weapon and yet be in Ryan or Wichita Falls when he was seen. We disagree. We first note the only people who testified with any degree of accuracy as to times were the hairdresser, who saw Margaret between 11:30 and 11:35 a.m.; the victim's mother, who testified she was "pretty sure" Margaret's car was at the house at 11:31, when Phillip returned from feeding cattle [4]; Ms. Lawson, who saw Appellant drive out of the Trammell driveway between 2:35 and 2:40 p.m.; and the employees of the credit union in Wichita Falls. People who saw Appellant and Margaret in the Ryan

convenience store either did not own watches or did not look at them, and claim the pair were in there anywhere from 11 a.m. to noon to 12:15 or 12:25 p.m. Given that wide variation of time, we find after viewing the evidence in the light most favorable to the prosecution Appellant could have gone to the Trammell house, killed or seriously injured Phillip as he was preparing to eat his cereal; then returned to the house after his Wichita Falls trip to check on his handiwork, finish the job if necessary, or clean a weapon.

We find Appellant's first proposition of error to be without merit.

### B.

 For his second proposition of error, Appellant contends the trial court erred in allowing into evidence statements made by Margaret Trammell after the murder. The trial court allowed in the statements under a "secondary conspiracy" theory. Although Appellant was charged with conspiracy to commit murder, he was not charged with any conspiracy occurring after the murder. The conspiracy in this case ended when the murder was accomplished. Therefore, the trial court's theory of admitting the statements under some "secondary conspiracy" is incorrect. *Jones v. State,* 738 P.2d 525, 527 (Okl. Cr.1987); *Kelly v. State,* 692 P.2d 563, 565 (Okl.Cr.1984).

 However, the fact the statements were inadmissible because they were not made in furtherance of a conspiracy does not automatically necessitate reversal. For instance, although Margaret's statement made to her son Eric minutes after discovering the body that "the union did it" were not made in furtherance of the already completed act, she was undeniably under stress at the time the

---

4. In his reply brief on this specific point (and at other times on other points), Appellant argues the victim's mother (or another witness) gave different testimony at earlier hearings, particularly here as to whether all three cars were present. We question the usefulness of this evidence. The issue before us is not the credibility of any individual witness; but whether there is

sufficient evidence to convict Appellant of first degree murder. It should go without saying the jury bases its verdict on the evidence presented during trial, when it is *present;* and not at other hearings, where it was *not* present. The mother was impeached by her earlier statements at trial, and the jury was free to give her testimony whatever merit they deemed proper.

statement was made.[5] It is therefore admissible under 12 O.S.1981, § 2803(2), the excited utterance exception to the rule against hearsay. *Griffith v. State*, 734 P.2d 303, 305 (Okl.Cr.1987).

■ Other statements do not fit so easily into an exception to the rule against hearsay. These include testimony by a house guest of Margaret Trammell that in 1989 he overheard Margaret tell Appellant on the telephone to say the "right things" and keep his mouth shut and he would get what was coming to him (although his observation that Margaret appeared upset and was crying are not hearsay; those observations were made by the witness himself, and he can be cross-examined on those). Also complained of on appeal are statements by Margaret to her son Eric that she rented Appellant an apartment in Wichita Falls so police "would not be snooping around so much"; that Margaret put an article in the Waurika paper announcing Appellant's marriage to another woman so people in Waurika would know Margaret and Appellant were no longer together; that Margaret said she and Appellant were dating other people to throw "police suspicion off"; that Margaret sent approximately $1,500 to someone in Florida to get charges dropped in Alabama; and that Margaret dismissed Eric's complaints about giving Appellant a Trans–Am and Eric's stereo because he had earned the items.

We agree these statements were improperly admitted. The danger of hearsay statements lies in a defendant's inability to cross-examine the declarant. Certain evidence is allowed under exceptions to the rule against hearsay because "[a]dmission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-

court statements." *Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990). If the confrontation clause is satisfied, there is no constitutional error.

■ Here, the confrontation clause was not satisfied. However, this denial of the right to cross-examination does not automatically necessitate reversal. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court enunciated the standard we use: whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Id. at 23–24, 87 S.Ct. at 827–828. *See also Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). As a result, the Supreme Court has held that a departure from constitutional procedures need not result in automatic reversal. Where the weight of the rest of the evidence is overwhelming and the prejudicial effect of the inadmissible evidence is insignificant, the error may be viewed as harmless. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In gauging the prejudicial effect of the admission of improper evidence, the Supreme Court has held that a reviewing court's judgment must be based on its own reading of the record and on what seems to have been the probable impact of the inadmissible evidence "on the minds of an average jury." *Id.* at 254, 89 S.Ct. at 1728. It is in this light we examine the improperly admitted evidence.

We discussed the sufficiency of the evidence in Appellant's first proposition. Significantly, in discussing that evidence and mindful of Appellant's complaint here, we determined the evidence against Appellant was sufficient without resorting to the evidence Appellant complains of in this proposition. Since we determined there any rational trier of fact could find beyond a reasonable

5. Appellant in his reply brief addresses this, stating if Margaret helped to kill her husband, she would not be excited about discovering the body. This is not necessarily true; the evidence is uncontroverted Margaret sought help to kill the victim, and there always exists the possibility she had not seen the handiwork before she discovered the body. But even if it were, this does not rule out the possibility she was excited or upset after authorities became involved, and fearful the insurance scheme would be discovered.

doubt the essential elements of the crime of murder without this improperly admitted evidence, we find upon our further review the evidence complained of had no impact on the minds of an average juror. We therefore hold the error here was harmless beyond a reasonable doubt. Consequently, Appellant's second proposition is without merit.

### C.

■ Appellant next complains the trial court committed reversible error when it allowed into evidence Margaret Trammell's settlement of a civil lawsuit involving the proceeds from the victim's life insurance policy. Specifically, Appellant's allegation of error is that any evidence of a settlement of civil litigation is not admissible in a criminal proceeding, pursuant to Oklahoma statutory provisions.

The prosecution called as a witness Hank Anderson, the attorney for the children in that civil suit, who testified the children made a claim to the victim's life insurance proceeds, citing "irregularities" in the circumstances surrounding the victim's death. As a result of the children's actions, the insurance company filed an interpleader suit naming both Margaret and Appellant as defendants. Margaret and the children settled the lawsuit during the course of the trial to determine who should receive the proceeds. The children received eighty percent, and Margaret receiving twenty percent, of the insurance proceeds and the victim's estate.

Appellant claims introduction of the evidence was prohibited under 12 O.S.1981, § 2408, which reads:

Evidence of:

1. Furnishing, offering or promising to furnish; or

2. Accepting, offering or promising to accept,

a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability

for the claim, invalidity of the claim or the amount of the claim.

Evidence of conduct or statements made in compromise negotiations is not admissible. This section does not require the exclusion of discoverable evidence merely because it is revealed in the course of compromise negotiations. This section does not require exclusion of evidence when it is offered for another purpose, including proof of bias or prejudice of a witness, negativing a contention of undue delay, or proof of an effort to obstruct a criminal investigation or prosecution.

12 O.S.1981, § 2408.

The issue of whether compromising a civil claim is admissible in a criminal proceeding is an issue of first impression in this state. After researching the issue, we hold there is no prohibition against admitting evidence of a settlement of a civil lawsuit in a criminal prosecution.

Appellant has cited *United States v. Hays,* 872 F.2d 582 (5th Cir.1989) and *Helms v. State,* 35 Ala.App. 187, 45 So.2d 170 (1950) in support of his contention public policy prohibits in a criminal trial evidence of settlement in a civil proceeding. While we agree within the context of these holdings there are strong public policy arguments for excluding offers of compromise in trial proceedings, we also recognize basic principles of statutory construction and the existence of other overriding public policy arguments which are applicable here.

Another federal circuit has examined the same issue. In *United States v. Gonzalez,* 748 F.2d 74 (2d Cir.1984), evidence a defendant had admitted defrauding a banking institution while attempting to settle a civil lawsuit was admitted in his criminal trial for the same offense. The court rejected his contention the statements should have been excluded under Evidence Rule 408, which is virtually identical to Oklahoma provision § 2408. The court first reasoned the evidence was not admitted to prove the validity of the claim, the prohibition under the Rule; then reasoned:

In addition, the primary policy justification for Rule 408's exclusion in the civil context does not apply in criminal prosecutions. Rule 408 is premised on the idea that encouraging settlement of civil claims justifies excluding otherwise probative evidence from civil lawsuits. Fed.R.Evid. 408 advisory committee note. However, encouraging settlement does not justify excluding probative and otherwise admissible evidence in criminal prosecutions. The public interest in the disclosure and prosecution of crime is surely greater than the public interest in the settlement of civil disputes. It follows that since nothing in the Rule specifically prohibits receiving in evidence the admissions and statements made at a conference to settle claims of private parties, they are admissible in any criminal proceeding.

*Id.* at 78. Yet another case from the same circuit re-enforces and adds to this view. In *United States v. Baker,* 926 F.2d 179 (2d Cir.1991), a criminal defendant in similar circumstances contended statements he made were inadmissible under Rule 408. The Court first used the plain language of the statute to show it was "fairly evident" Rule 408 applied only to civil litigation. *Id.* at 180. It then noted the existence of Rule 11(e)(6) of Federal Rules of Criminal Procedure,[6] noting this specific statute dealing with plea bargaining and statements made in criminal prosecutions "strongly supports the conclusion that Rule 408 applies only to civil matters" *Id.* The same is true in Oklahoma. When our Legislature adopted the rule virtually identical to the Federal Rules, it also adopted the reasoning behind the rules. *See Freeman v. State,* 767 P.2d 1354 (Okl.Cr.

1988) (interpreting § 2404 in accordance with federal caselaw, citing to *Robinson*); *Robinson v. State,* 743 P.2d 1088, 1090 (Okl.Cr. 1987) ("We turn to the federal rules, upon which Oklahoma's rules are based, under the assumption that in adopting the Federal rules in an effort to promote uniformity, our legislature also adopted the philosophy and interpretations of those rules as litigated in the federal courts.")

This philosophy is also adopted in other jurisdictions. *See State v. Burt,* 249 N.W.2d 651, 652 (Iowa 1977) (In holding a shoplifting defendant's subsequent offer to the store to pay for the item taken was admissible as a "quasi-admission against penal interest," the court stated "[t]he public policy of promoting compromise which lies behind the exclusionary rule in civil controversies has no application in the criminal law field where statutory safeguards against compounding felonies and offenses apply"). *See also State v. Milum,* 197 Conn. 602, 500 A.2d 555, 561 (1985); *People v. Gambony,* 402 Ill. 74, 83 N.E.2d 321, 325 (1949); *Moulder v. State,* 154 Ind. App. 248, 289 N.E.2d 522, 527 (1972); *Conner v. State,* 362 N.W.2d 449, 458–59 (Iowa 1985); *Commonwealth v. Leo,* 379 Mass. 34, 393 N.E.2d 410, 414–15 (1979); *State v. Doak,* 89 N.M. 532, 534–35, 554 P.2d 993, 995–96 (Ct.App.1976); *State v. Hackett,* 560 S.W.2d 627, 628 (Tenn.1978); *Carter v. State,* 161 Tenn. 698, 34 S.W.2d 208, 208–09 (1931).

▪ Having established the evidence is not barred by 12 O.S.1981, § 2408, we turn to whether the trial court abused its discretion in admitting it against Appellant. We do so using the basic principles of relevancy.

▪ In dealing with the relevancy of evidence, we begin with the presumption that in

---

**6.** Although different in wording, this Rule is virtually identical to 12 O.S.1981, § 2410, dealing with the admissibility of offers to plead guilty or nolo contendere. The Oklahoma Rule reads:

> Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding

against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in criminal proceedings for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

See the evidence subcommittee's observations comparing § 2410 and the federal rule.

determining whether to admit such evidence, the trial judge should lean in favor of admission, *Freeman v. State,* 767 P.2d 1354, 1356 (Okl.Cr.1988); *Bear v. State,* 762 P.2d 950, 956 (Okl.Cr.1988). The burden is on the party opposing its introduction to show it is substantially more prejudicial than probative. *Croney v. State,* 748 P.2d 34, 37 (Okl.Cr. 1987). When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *See Wall v. State,* 763 P.2d 103, 105–06 (Okl.Cr.1988).

Here, there is little relevancy in admitting evidence Appellant was a party to the civil lawsuit. There is no indication in the record he had any input in the lawsuit's disposition. To that extent, it was error to admit State's Exhibit 9, a copy of the order dismissing the case and releasing the funds. Likewise, whether Margaret Trammell or one of the victim's daughters was executor of the estate is of little consequence to the issue whether Appellant killed the decedent.

 The prosecution's case was based on the theory Margaret, as sole beneficiary under the policy, wanted the victim dead so she could collect on his insurance policy; and Appellant agreed to kill the victim in exchange for a portion of those proceeds. That it coincidentally showed Margaret was willing to lose a substantial portion of the proceeds to minimize the risk of criminal exposure is irrelevant to whether Appellant possessed the necessary intent to kill the decedent. However, giving the evidence its maximum probative value and minimum prejudicial effect, *see Wall, supra,* we find evidence of Margaret's settlement and subsequent collection of 20 percent, or approximately $44,-000, was admissible, as the evidence of the compromise showed her ability to pay Appellant, the basis for his participation in the murder.

 In light of this discussion, we find any error in admitting the portion of the evidence deemed irrelevant was harmless.

Further, we find no reversible error in the prosecution's failing to provide more advanced notice of attorney Hank Anderson as a witness, as set forth by Appellant and addressed in section I.D., above. There is little Appellant's counsel could have done differently than he did had he had more notice of the witness. Counsel made appropriate objections, which were overruled. Additionally, counsel indicated to the court he was aware of the substance of Anderson's testimony.

Appellant's third proposition of error is denied.

### D.

 For his fourth proposition of error, Appellant claims his conviction should be reversed because the prosecution was allowed to enter into evidence that co-defendant Margaret Trammell took a polygraph. At trial, the prosecutor asked witness Danny Chisum about statements made by Appellant. Chisum replied Appellant told him if Margaret did not pass the polygraph examination, he would probably leave town.

Appellant cites a number of cases which hold results of a polygraph are inadmissible at trial. We agree, and have no reason to revisit those holdings.

However, as the State points out, the results of the polygraph test were not introduced into evidence here. Furthermore, when the evidence is read as a whole, it is evident the prosecutor asked the question about the polygraph not to imply that the test was passed or failed, but rather to establish Appellant's knowledge and intent in the crime, together with a point of reference as to the time Appellant made his statement he may have to leave town. There was no evidence Appellant himself took a polygraph. Under the circumstances, we find the reference to a polygraph, if error at all, was harmless. *Cf. Harris v. State,* 841 P.2d 597, 602 (Okl.Cr.1992) (results of polygraph test not admitted at trial; Court recognizes "value and usefulness of the polygraph examina-

tion as an instrument of investigation"); *Weatherly v. State,* 733 P.2d 1331, 1336 (Okl. Cr.1987) (introduction harmless error); *Sheppard v. State,* 670 P.2d 604, 605 (Okl.Cr. 1983); *Kapocsi v. State,* 668 P.2d 1157, 1161 (Okl.Cr.1983) (reference to polygraph harmless error when defendant not given test and no test results admitted into evidence).

Accordingly, we find no merit to this fourth proposition of error.

### E.

■ In his fifth assignment of error, Appellant contends he should receive a new trial because evidence was introduced indicating he had a propensity for violence. We agree the evidence he complains of was improperly admitted. However, we disagree reversal is warranted.

■ First, Appellant cites testimony by Deborah Choat, who related an incident during which Appellant threatened to "whip" everyone present. This "other wrong" was inadmissible. *Freeman v. State,* 767 P.2d 1354, 1356 (Okl.Cr.1988). However, the prosecutor asked the question during redirect examination in response to an earlier question by defense counsel, who asked the witness if she knew of any personal relationship problems. As such, it came in the form of invited error, and Appellant cannot now complain of it. *Pierce v. State,* 786 P.2d 1255, 1259 (Okl.Cr.1990); *Gourley v. State,* 777 P.2d 1345, 1349 (Okl.Cr.1989); *Rouse v. State,* 594 P.2d 787, 792 (Okl.Cr.1979).

■ The same arguably could also be said of his other complaint, that the prosecutor on redirect examination elicited from witness Connie Perry she stopped seeing Appellant because he would "demand things" and was "wanting drugs." Defense counsel asked several questions on cross-examination pertaining to who broke off the relationship, and whether the witness had been interested in seeing Appellant again.

■ Both instances occurred during redirect examination and were not central to the witnesses' testimony. Any error of the trial court in allowing in the evidence does not amount to reversible error in light of all the evidence presented, as these errors do not amount to a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. 20 O.S.1991, § 3001.1.

This proposition is without merit.

### F.

■ Appellant next complains the trial court erred in refusing to allow him to re-cross-examine witness Scott Chatham after Chatham testified on redirect-examination he had not been promised, forced or threatened to make a statement to authorities which tended to implicate Appellant in the murder. We find no error, as Appellant had an opportunity to cross-examine the witness on the subject the first time around.

Appellant concedes, as he must, that a trial court has discretion to limit recross-examination, especially when no new matters have been raised on redirect. *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). However, Appellant overlooks the fact that during direct examination, Chatham testified he had not been promised anything for making the statement. Therefore, Appellant had the opportunity to explore this area during cross examination; he failed to do so. He therefore cannot complain of it now.

Nor do we find the court's actions amounted to constitutional error. This Court in *Wing v. State,* 727 P.2d 1383, (Okl.Cr.1986), utilized factors enunciated by the United States Supreme Court to help it consider whether a trial judge committed constitutional error in restraining counsel's proposed cross-examination: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) whether there was evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecutor's case. *Id.*

at 1385 (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

■ When considering these factors, together with the fact Chatham had already testified he had received nothing in return for his statement to authorities and the fact Appellant had the ability to call the witness for himself, *see Farmer v. State,* 507 P.2d 1303, 1307 (Okl.Cr.1973); *Smith v. State,* 562 P.2d 909, 912 (Okl.Cr.1977), we find that error, if any, does not require reversal of Appellant's sentence. This proposition of error, Appellant's sixth, is without merit.

### G.

■ Appellant in his seventh assignment of error claims the trial court erred in admitting the victim's recently-cleaned .410 shotgun and Appellant's pocket knife. He claims the items were irrelevant, as the State did not prove either item was actually used in the murder.

The fact there was no direct proof either item was used to commit the murder does not end the analysis. Our statutes allow into evidence anything "having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S. 1981, § 2401 (emphasis added); *see also* 12 O.S.1981, §§ 2402, 2403.

Under section 2403, otherwise relevant evidence is admissible unless the court determines its probative value is substantially outweighed by its prejudicial effect. In deciding whether to admit evidence, the trial court should lean in favor of admitting the evidence. *Freeman,* 767 P.2d at 1356; *Bear,* 762 P.2d at 956. When measuring the relevancy of evidence against its prejudicial effect, this Court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *See Wall,* 763 P.2d at 105–06. The party objecting to its admission has the burden of showing its introduction is substantially more prejudicial than probative. *Croney,* 748 P.2d at 37.

■ We find the evidence was properly admitted. The medical examiner testified the victim had five knife wounds made by a knife blade the same approximate size of Appellant's pocket knife. While the knife wounds themselves would not have been immediately fatal, they did contribute to the victim's demise. The same can be said for the shotgun. Testimony showed a shotgun wound contributed to the victim's death; and the size and number of pellets found in the body were consistent with the size and number of pellets found in a .410 shotgun shell. The items were therefore relevant evidence. The jury was also aware the items were not positively connected to the murder. Therefore, the prejudicial effect of the items did not substantially outweigh their probative value. Demonstrative evidence is admissible if it is relevant and the probative value of the evidence outweighs its prejudicial effect. *Romano v. State,* 847 P.2d 368, 382 (Okl.Cr. 1993); *Woodruff v. State,* 846 P.2d 1124, 1135 (Okl.Cr.1993); *Owens v. State,* 747 P.2d 959, 961 (Okl.Cr.1987).

This assignment of error is without merit.

### H.

■ In his eighth proposition, Appellant complains it was error to introduce into evidence a gun-cleaning kit because no proper chain of custody was established. Testimony established the kit was discovered in the victim's closet by his relatives in July 1989 while they were cleaning out the Trammell house. The kit was placed on a dresser until sometime in August, when it was taken home by a daughter and placed on her refrigerator. It remained there until it was given to authorities in January 1990.

Appellant complains about the chain of custody because the outside cover of the kit contained Appellant's fingerprint. Evidence established the victim was shot by a shotgun, and Appellant told an jail inmate he cleaned the murder weapon after using it.

Appellant argues the chain of custody here is important because the State never established when the fingerprints were left. He claims this is important because the evidence is undisputed he lived at the Trammell residence for several weeks following the murder. He claims he must have left his fingerprints on the kit when he was helping Margaret clean up after a search of the residence.

While we recognize the general necessity of establishing a chain of custody on evidence, we fail to see how establishing a more thorough chain here would have helped or hindered Appellant. Appellant has produced no evidence showing anyone could have left his fingerprints on the kit except Appellant himself. Whether Appellant placed his fingerprints there after cleaning a weapon or a few weeks later while helping Margaret clean up is immaterial insofar as preservation of the evidence is concerned. The fact is, the fingerprints were preserved on the kit, and there was no hint of any tampering with the evidence. This Court has held countless times that any doubts as to the preservation of the evidence goes to its weight, and not its admissibility. *See Nelson v. State*, 687 P.2d 744, 746 (Okl.Cr.1984). *See also Williamson v. State*, 812 P.2d 384, 397–99 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); *Shultz v. State*, 811 P.2d 1322, 1332 (Okl.Cr.1991). We find absolutely no merit to this proposition.

## I.

■ Appellant next complains the photographs introduced at trial should not have been introduced, as they were not relevant and were prejudicial. Appellant admits the photographs did not show the actual wounds; rather, they showed the victim lying near the front door in a pool of blood.

We are not disturbed by these photographs. They were referred to by witnesses to show location of the body as found; to show the body had been dragged back from the front door; and to show the victim initially was lying on his back, and not on his side as he was when he was found. All these things were important to the State's theory of the case: that the 275–pound victim was attacked while eating; tried to get away; was dragged back from the open door either while unconscious or otherwise incapacitated to allow the door to be closed; then at some point assaulted again while in shock or near death.

We find the photographs relevant to establish these issues, they were not cumulative, and their probative value was not substantially outweighed by their prejudicial effect. 12 O.S.1981, § 2403. They may be somewhat gruesome, but as we have said before, "[g]ruesome crimes result in gruesome photographs." *McCormick v. State*, 845 P.2d 896, 898 (Okl.Cr.1993). *See also Fritz v. State*, 811 P.2d 1353, 1365 (Okl.Cr.1991); *Nguyen v. State*, 769 P.2d 167, 171 (Okl.Cr. 1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

There is no merit to this, Appellant's ninth proposition.

## J.

■ In his tenth proposition, Appellant contends there was insufficient evidence to support his conviction for conspiracy to commit murder. We disagree.

■ To prove a conspiracy, a prosecutor must prove two essential things: an agreement between two or more people to commit an unlawful act; and some overt act by one or more parties in furtherance of the conspiracy to effect its purpose. 21 O.S.1981, §§ 421, 423; *State v. Davis*, 823 P.2d 367, 369–70 (Okl.Cr.1991). We have held a conspiracy may be established by circumstantial evidence. *Id.*

Here, Appellant himself told several people Margaret asked him if he knew anyone who could kill Phillip. Appellant also said he was going to get a large sum of money; that he was playing a ten-thousand-dollar game, the amount of money he expected to get; and that "accidents can happen." The victim had

a large insurance policy. He also spent time sharpening his knives in front of other people, saying he needed to get it sharp because he would have to use it for something; he did not specify what the "something" was, but did say he was going to do a big favor for Margaret. He told his uncle he was going to get a new car with money Margaret would give him. When asked how, Appellant said "she" was going to have her husband killed and then collect the insurance money; taken in context of the surrounding conversation, the uncle understood the "she" to be Margaret.

In the light most favorable to the prosecution, there exists sufficient evidence to convict Appellant of conspiracy to commit murder. *Cooper v. State*, 584 P.2d 234, 238 (Okl.Cr.1978); *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985). This proposition is without merit.

## III. ISSUES RELATING TO SECOND STAGE

### A.

In his sixteenth proposition of error, Appellant contends he had incompetent assistance of counsel during the second stage of his trial because he failed to present certain evidence.[7] As proof, he has submitted eleven affidavits from people who knew him as a child and while growing up.

■ To prove ineffective assistance of counsel, Appellant must show not only that his attorney's performance fell below acceptable levels of professionalism, he must also show this substandard performance had an effect on the outcome of the proceeding.

Unless an appellant can show both, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williamson*, 812 P.2d at 384. The fact a defense attorney could have done more investigation into a defendant's background for mitigating evidence alone does not establish ineffective assistance of counsel. *Dutton v. Brown*, 812 F.2d 593, 598 (10th Cir.1987); *Stafford v. State*, 665 P.2d 1205, 1213 (Okl.Cr.1983). This Court has held it will not second-guess trial strategy on appeal. *Williamson*, 812 P.2d at 412. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 413.

■ We must first decide whether the affidavits presented in Appellant's supplemental record should be admitted here.[8] The applicable rule at the time Appellant filed his materials stated:

After an appeal has been lodged in this Court, and upon application of either party or upon this Court's own motion, the majority of the Court may, within its discretion, direct a supplementation of the record, when necessary, for a determination of any issue properly raised on appeal; or, when necessary, may direct the trial court to conduct an evidentiary hearing on the issue.

Rule 3.11, *Rules of the Court of Criminal*

---

7. Significantly, Appellant does not claim his attorney was incompetent during the first stage of the proceeding. We commend appellate counsel for refraining from raising frivolous issues, as that one would be; and we commend Mr. Prince, as trial counsel, for his exemplary work during the first stage of Appellant's trial.

8. We acknowledged at the beginning of oral argument the supplemental record filed by Appel-

lant on April 28, 1993, had been accepted. However, as with all supplemental materials, there is a distinction between accepting materials for the purpose of considering whether they should be filed; and automatically accepting materials for filing in the case. Accepting materials for consideration does not automatically lead to proper consideration on an appeal.

*Appeals,* 22 O.S.1991, Ch. 18, App..[9]

We have had few opportunities to address just how far this Court will go in allowing such *ex parte* supplementations of the record. A review of the few cases in which the Rule is mentioned reveal the underlying philosophy behind it. It is clear the Rule is designed "to permit the supplementation of the record on appeal, not the relitigation of factual questions determined in the trial court." *Johnson v. State,* 731 P.2d 993, 1000 (Okl.Cr. 1987). The reason for this is clear: to allow unbridled appellate *ex parte* hearings is not in the best interest of either party or of the appellate system. While we want to afford both parties an ample opportunity to present their case, we are not a trial court. If an appellant uncovers new evidence which would be of value to the trial court, he should present it in the form of a motion for new trial. This gives the other party an opportunity to respond, *cf. Matter of M.W.N.,* 590 P.2d 692, 695 (Okl.Cr.1979) and the trial court to correct its own mistakes. Therefore, attempts to supplement a record on appeal with *ex parte* testimony by affidavit will be strictly scrutinized to determine if the presumption against admission has been overcome.

However, we are also cognizant that there are certain instances where this would not be effective. Effective assistance of counsel is one of those instances. Strategic choices aside, it is unrealistic to expect a counsel whose performance fell below an acceptable standard to suddenly improve his performance to the point where he could present evidence he was unable to present just days before. Consequently, a more extended analysis is necessary here.

Typically, requests to supplement the record have been granted without either discussion or examination of the materials; however, it is clear that is not the intention of Rule 3.11. Rather, this Court will use its discretion to determine whether the supplementa-

tions are to be admitted, based on the unique circumstances of each case.

To determine whether the supplemental materials should be granted here, we must examine the underlying law of effective assistance of counsel. In *Strickland,* the Supreme Court directed a reviewing court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.,* 466 U.S. at 689, 104 S.Ct. at 2065. It follows that, at least here, where incompetent counsel is claimed, an Appellant must come forth with sufficient evidence to rebut that strong presumption. We must therefore examine the proffered materials, at least to some extent, to see if they are of value in accomplishing that goal. If they are not, they are extraneous and shall not be admitted.

■ The post-trial affidavits attest to Appellant's abusive father; Appellant's generous nature; his general lack of a loving and supportive family environment; his inability to deal with the knowledge the man he thought was his father was in reality his stepfather; his intelligence; his wonderful way with children; and his attitude as a hard worker.

On the other hand, one affidavit largely makes observations based on what the affiant heard had happened to Appellant while he was growing up. Another, from his mother, asserts that in an attempt to help, she called Appellant's attorney, who told her "not to worry about it." However, she asserts she never spanked or slapped her children; and her husband would discipline the children by a belt or paddle. This information is in direct contradiction to comments by other affiants Appellant's father beat and slapped him; and his mother slapped him and spit chewing tobacco in his face, was mean to him, and told him he would have to move because he was not wanted. In light of these contradictions between this affidavit and the others, we doubt the evidence offered by Appellant's mother have any effect on a jury.

---

**9.** We have since further defined the parameters for filing supplemental materials. *See* Rule 3.11, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp.1993, Ch. 18, App.. We need not address those changes at this juncture.

A sizeable number of the affidavits speak in couched terms such as Appellant "had his faults"; he "had his share of problems"; he "was not always a saint"; he "was not always truthful with me and sometimes he liked to act like a 'big shot' "; or "I know Bill has not always done the right thing in his life." One from Deborah Choat, a prosecution witness in the first stage, paradoxically states that "[a]lthough I testified that Bill once tore off Diamond's blouse out of jealousy and that he once said he would whip us all when he was mad," she never considered him violent and was not fearful of him. These comments at best give Appellant faint praise.

Here, we are convinced the outcome of Appellant's sentencing proceeding would not have changed had evidence such as that set forth in Appellant's affidavits been introduced at trial. Appellant introduced a sizeable portion of that evidence when he testified in the second stage; in fact, as noted below, the prosecutor commented on it during closing argument. *Ex parte* assertions Appellant once gave his lunch to a hungry dog, once gave his last ten dollars to a stranger, once hauled in a load of firewood or once played guitar at a nursing home does not detract from the fact that he also once killed a man by beating, stabbing and shooting him, leaving his victim to languish for some time before he died.

Appellant's proffered evidence fails to rebut the strong presumption of competent counsel; consequently, we deny the motion to supplement the record with these affidavits.

Appellant also asks us to remand for an evidentiary hearing on the effectiveness of counsel. He claims the proffered evidence is not meant to be exhaustive, but support his contention on appeal such evidence was available and relatively easy to procure. Since Appellant has failed to make even a threshold showing his proffered evidence would rebut the presumption of effective counsel, and he has given this Court no indication additional evidence would be anything other than similar to that offered by his affidavits,

it follows an evidentiary hearing is not necessary.

This proposition of error is without merit.

### B.

▪ During second-stage deliberations in Appellant's trial, the jury sent out a note which asked if life without parole was given, was there ever a possibility of release from prison. The judge told the jurors the instructions they had were self-explanatory. In his seventeenth proposition, Appellant now claims this was error.

We first note that when the court asked defense counsel whether his response was agreeable, defense counsel stated it was "quite all right." He has therefore waived the proposition for review on appeal.

Appellant points to this Court's previous caselaw holding parole was not an appropriate subject for a jury's consideration, and claims these holdings, which he claims were essentially adhered to by the trial court, prevented his jury from fully understanding, and therefore considering, the option of life without parole more recently enacted by our Legislature. We disagree.

▪ The legislature's actions in making life without parole a viable sentencing option in first degree murder cases has obviously modified this Court's previous rulings insofar as they mandate a blanket prohibition against the jury's considering parole in deciding which sentence is appropriate. By its actions, the Legislature has created a specialized area of the law which mandates the jury must consider the possibility of parole in determining whether a defendant convicted of first degree murder must live or die. Therefore, we must modify our previous rulings, but only insofar as the punishment for first degree murder is concerned; if the Legislature did not want a jury considering parole, it would not have included the term in a sentencing option.

▪ However, that does not mean the trial court erred when it told the jury the

instructions were self-explanatory. The reason a court is generally prohibited from mentioning parole lies not in any incentive to keep jurors ignorant of its existence, but rather because it is a discretionary procedure exercised by the executive branch which provides for a condition subsequent to the conviction and sentence after the party has been incarcerated in the state penitentiary. In other words it is offered as a reward in the form of commutation for good behavior of the inmate after he has been convicted. *Cosby v. State,* 85 Okl.Cr. 159, 166–67, 186 P.2d 844 (1947) (citing *Bean v. State,* 58 Okl.Cr. 432, 438, 54 P.2d 675 (1936)). To have a trial judge tell a jury how long any particular inmate will serve after his conviction is asking him to see into the future. It would be both unrealistic and unwise to burden the already overworked trial judges of our state with the responsibility of being soothsayers.

Appellant points to a New Mexico case where that state's supreme court held it was error for the trial court to refuse a requested instruction telling the jury when an inmate would be eligible for a parole hearing. That court based its decision on its interpretation of the Eighth Amendment to the United States Constitution, holding that to give the jury the information on when one would be eligible for a parole hearing satisfies the requirement that "the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *State v. Henderson,* 109 N.M. 655, 658, 789 P.2d 603, 606 (1990) (quoting *California v. Ramos,* 463 U.S. 992, 1003, 103 S.Ct. 3446, 3454–55, 77 L.Ed.2d 1171 (1983)). Appellant also argued the Maryland Supreme Court in *Bruce v. State,* 318 Md. 706, 569 A.2d 1254, 1269 (1990) reached the same conclusion.

We disagree such specificity is required here. New Mexico has a specific provision (N.M.Stat.Ann. § 31–21–10 (1988)) governing parole for a person convicted of a capital felony. Likewise, Maryland also has a specific parole provision in murder cases (Md. Ann.Code art. 41, § 4–607(b)(2) (1957, 1986 Repl.Vol.). This code formed the basis of the Maryland court's holding in *Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988), upon which *Bruce* was based (holding a defendant had the right to present evidence to the jury he would not be paroled until he had served at least 25 years or its equivalent).

In contrast, Oklahoma does not have a specific parole provision for defendants given life sentences for first degree murder. Our general parole provision states an inmate must be considered when one-third of his sentence has been served. 57 O.S.1991, § 322.7(A). However, there is no prohibition in our statutes to keep an inmate from petitioning the Pardon and Parole Board seeking an earlier release at any time. If this is done, and three board members agree the petition should be heard, he can go before the parole board. 57 O.S.1991, § 322.7(D). In other words, while the New Mexico and Maryland provisions *prohibit* a murderer from being considered for parole for a specific time, Oklahoma's provisions have no such provision. Rather, they mandate that he *must* be considered for parole at a specific time; and he is not prohibited from seeking release at an earlier time.

The purpose of this dicta is not to provide an overview of the policies and procedures of the Pardon and Parole Board; nor is it intended to indicate the wisdom or folly of any inmate seeking or receiving early release by parole. Instead, we only wish to point out the procedure for an Oklahoma defendant convicted of first degree murder is not specifically delineated, and the possibility of parole can vary from inmate to inmate. Under those circumstances, any attempts by a judge to define the parameters of parole for any particular inmate in the future would not present the jury relevant information, but rather would tend to lend an air of capriciousness to the sentencing proceeding which could run afoul of the Eighth Amendment.

Appellant at oral argument suggested this Court could adopt an instruction based on Okla. Const. art. 6, § 10. His attorney claimed this provision would inform the jury neither the governor nor the Pardon and

Parole Board has authority to parole anyone given life without parole. While we agree this language is contained in that constitutional provision, we also note—and Appellant admitted at oral argument—this provision also deals with the ability of the governor to provide clemency in the form of sentence commutation. While we agree with Appellant's assertions this might allow the jury to have before it all possible relevant information about the individual defendant whose fate it must determine, we do not see how the information concerning the governor's ability to commute a sentence to one where parole was a possibility assists a defendant facing the death penalty. "In fact, advising jurors that a death verdict is theoretically modifiable, and thus not 'final,' may incline them to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers." *California v. Ramos,* 463 U.S. 992, 1011, 103 S.Ct. 3446, 3458–59, 77 L.Ed.2d 1171 (1983) (holding instruction on governor's power to commute not constitutionally required). "In short, an instruction disclosing the Governor's power to commute a death sentence may operate to a defendant's distinct disadvantage." *Id.*

 Therefore, while we hold a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, we also hold there is no requirement for a trial judge to explain the Oklahoma parole process to a jury. *Cf. Saffle v. Parks,* 494 U.S. 484, 490, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990) ("There is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision and rules that govern how the State may guide those factors in reaching a decision.") We believe the concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further. *See Bruce,* 318 Md.

706, 569 A.2d at 1270 (McAuliffe, J. dissenting) (author of *Doering* case, used as basis for *Bruce,* stating "[t]he meaning of the term [life without parole] is self-evident, and particularly so when it is presented to the jury as an alternative to the sentence of life imprisonment").[10] We refuse to open a floodgate of parole information which would serve only to muddy the waters, and could later be used to drown other defendants downstream.

The trial court did not err when it told the jury the instructions were self-explanatory. This is the response that judges should provide to jurors' inquiries regarding the meaning of life without parole as a sentencing option. Therefore, we find no fundamental error here. This seventeenth proposition of error is without merit.

### C.

 Appellant in his eighteenth proposition of error complains there was insufficient evidence to support the jury's finding the murder was especially heinous, atrocious or cruel. Again, we disagree.

The victim was beaten at least four times in the front of the head and 13 times in the back of the head with a blunt object, stabbed five times in the neck and chest, and shot with a shotgun. The damage was so extensive officers who arrived on the scene were initially unable to determine what instrumentation caused the death. In addition to several blows to the front of the head, there were several blows to the back of the head which were administered at a different time (as late as four to eight hours after the front of the head was beaten), when the victim was in shock or near death. The victim bore bruises consistent with defensive wounds, indicating he tried to fend off at least some of the blows. The trail of blood in the house also indicates the attack began in the kitchen, continued through the hallway and ended at the front door, where the victim apparent-

---

10. In fact, the absence of an instruction could operate to a defendant's distinct advantage. A defense attorney can comment on the plain, self-explanatory language of the statute prohibiting parole; while at the same time not subjecting a defendant to the detriment the aura of the possibility of commutation might impose.

ly tried to escape, was overcome, dragged back from the door and beaten some more.

The medical examiner also testified the stab wounds would not be fatal if immediately treated. The same is true of the head injuries sustained from the beating. Even the shotgun blast, which lodged approximately six pellets in the heart itself, would not be immediately fatal. Rather, the medical examiner estimated the victim could have lived as long as eight hours with his injuries, and most likely suffered and experienced pain.

We hold this evidence, when viewed in the light most favorable to the prosecution, supports the jury's finding the death was especially heinous, atrocious or cruel, as it indicates the death was preceded by torture or serious physical abuse of the victim. *Crawford v. State*, 840 P.2d 627, 641 (Okl.Cr.1992); *Battenfield v. State*, 816 P.2d 555, 565 (Okl. Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

This proposition is without merit.

### D.

■■■ In his nineteenth proposition of error, Appellant argues his sentence of death must be vacated because the instruction to the jury was unconstitutionally vague. He cites *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), in support of his argument. He acknowledges the complete instruction was given [11]—unlike the situation in *Cartwright*—but still contends the instruction as given is too vague to give guidance to the sentencer.

11. The instruction as given mirrors the language of OUJI–CR 436, and read:
 As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others. The phrase "especially heinous, atrocious or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse. (O.R. 393). It was the absence of this second paragraph which caused the instruction in *Cartwright* to be constitutionally infirm.

We addressed this argument in *Nuckols v. State*, 805 P.2d 672, 674 (Okl.Cr.1991), *cert. denied*, 500 U.S. 960, 111 S.Ct. 2276, 114 L.Ed.2d 727 (1991). We see no need to address it again. *See also Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511, 529 (1990); *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *United States v. Pretlow*, 779 F.Supp. 758, 773 (D.N.J.1991); *United States v. Cooper*, 754 F.Supp. 617, 623 (N.D.Ill.1990); *Nguyen v. State*, 769 P.2d 167, 174 (Okl.Cr.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

We find no merit to this proposition.

### E.

■■■ Appellant in his twentieth proposition of error alleges the trial court's "antisympathy" instruction given in the first stage of the trial and incorporated by reference into the second stage denied him his right to have the jury fully and fairly consider his mitigating evidence. We disagree.

We have addressed this issue before and have continually found it to be lacking. *Stout v. State*, 817 P.2d 737, 740 (1991). We do so again.[12] We find no merit to this proposition of error.

### F.

■■■ Appellant in his twenty-first proposition of error argues the court's instructions dealing with mitigating circumstances are unconstitutional, as the language telling the

12. We also note that the incorporating instruction told jurors first-stage instructions "apply where appropriate." (O.R. 401). The jury was also given a definition of mitigating instructions, which "are those which, *in fairness and mercy*, may be considered as extenuating or reducing the degree of moral culpability or blame" (O.R. 395) (emphasis added). Any reasonable juror would read the words "in fairness and mercy" as allowing them to consider the mitigating evidence in its entirety.

jurors his mitigating evidence "may be considered" allowed them to ignore his mitigating evidence altogether.

We have rejected this argument as well. *Williamson v. State*, 812 P.2d 384, 409 (Okl. Cr.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). We do so again.

### G.

▪ Also previously considered and rejected is Appellant's twenty-second argument, that although the jury was instructed it had to find the aggravating circumstance beyond a reasonable doubt, it was not instructed it also must find beyond a reasonable doubt the aggravating circumstance outweighed the mitigating evidence. *Williamson*, 812 P.2d at 409–10. Appellant has presented no authority to convince us our previous holding was improper, and we therefore reject it again.

### H.

▪ Appellant next contends the court erred in not giving to the jury an instruction telling them they had the option of returning a life sentence regardless of its finding the presence of the aggravating circumstance. This, too, has been considered and rejected in previous opinions of this Court. *Williamson*, 812 P.2d at 410. Consequently, Appellant's twenty-third proposition of error fails.

### I.

▪ In his twenty-fourth and last proposition of error, Appellant claims he was denied a fair second-stage trial because the instructions concerning mitigating circumstances did not specifically state the jurors need not find any mitigating circumstance unanimously. We disagree.

In support of this proposition, he relies on *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). There,

North Carolina had required that jurors be unanimous in their finding of any mitigating evidence. If all twelve jurors did not agree that the mitigating evidence was present, all jurors were precluded from considering that evidence. The Supreme Court also observed that even if all 12 jurors agreed that there was some mitigating circumstances, North Carolina's scheme prevented them from giving effect to evidence supporting any of those circumstances in deliberations unless they unanimously found the existence of the same circumstances. *Id.* at 438–41, 110 S.Ct. at 1231–32, 108 L.Ed.2d at 378–79. It was this barrier to the Eighth Amendment requirement requiring states to allow consideration of mitigating evidence that made the North Carolina instructions constitutionally infirm. *Id.* at 442, 110 S.Ct. at 1232, 108 L.Ed.2d at 380.

▪ Such is not the case in Oklahoma, for there is no unanimity requirement for the consideration of mitigating circumstances. *Stiles v. State*, 829 P.2d 984, 997 (Okl.Cr. 1992). The appropriate question then becomes whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1193, 108 L.Ed.2d 316 (1990). And although a defendant does not have to establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, "a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition." *Id.*

The rationale for such a standard is obvious:

There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation.[13] Jurors do not sit in solitary isolation booths parsing instructions for

---

**13.** At this point the Supreme Court compared the

standard for review with that of ineffective assis-

subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* at 380–81, 110 S.Ct. at 1198.

Appellant has presented nothing to prove the jurors misunderstood the law. Therefore, we find no error. *Stiles,* 829 P.2d at 997. *See also People v. Rodriguez,* 794 P.2d 965, 980–81 (Colo.1990) (arriving at same conclusion as this Court: no constitutional requirement for instruction telling jury its findings concerning mitigating circumstances must be unanimous). *Cf. McDougall v. Dixon,* 921 F.2d 518, 539 (4th Cir.1990), *cert. denied,* 501 U.S. 1223, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991) (on habeas from North Carolina court: instruction mandating unanimous verdict on mitigating circumstances not given in petitioner's trial; death sentence affirmed); and *Fox v. State,* 779 P.2d 562, 575 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990) (incorporating a higher standard: no "substantial possibility" any reasonable juror would have rested a verdict on improper interpretation of "anti-sympathy" instruction given in the first stage and incorporated by reference into the second stage of a capital murder trial).

This proposition is without merit.

## IV. PROSECUTORIAL MISCONDUCT

Appellant in his fourteenth proposition of error advances a number of instances he claims amount to prosecutorial misconduct during closing argument in both the first and second stages of trial.

### A.

■ Appellant first complains of comments during the first stage. He begins by

tance of counsel; deportation of potential witnesses; failure to disclose exculpatory evidence; and new trial based on newly discovered evi-

accusing the prosecutor of making disparaging comments about him, and expressing personal opinion of his guilt. We initially note he failed to object to the prosecutor's calling Appellant a "braggadocios" or a "big man." He has thus waived the objection for all but fundamental error. *Moore v. State,* 788 P.2d 387, 398 (Okl.Cr.1990). Moreover, we see no fundamental error. Evidence during the trial indicated Appellant bragged frequently, and commented he had never been beaten in a fight. We view the prosecutor's remarks here as fair comments on the evidence. *See Romano v. State,* 847 P.2d 368, 380 (Okl.Cr. 1993); *Clayton v. State,* 840 P.2d 18, 29 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

■ Nor do we find fundamental error in the unobjected-to comments Appellant interprets as expressions of personal opinions by the prosecutor as to his guilt. The prosecutor in two instances commented on the evidence, ending with words to the effect "there's only one person who knows" what transpired. We have held it is not improper for a prosecutor to state his opinion as to a defendant's guilt when it is based upon evidence which reasonably tends to support the conclusion. *Walker v. State,* 556 P.2d 1317, 1320 (Okl.Cr.1976).

■ Appellant also complains the prosecutor badgered him during cross-examination by asking him if the victim begged for his life like Appellant was begging for his on the stand. However, we are unable to find support for this assertion in the citation to the record provided by Appellant. A brief must state the precise error and a sufficient record for this Court to understand the issue presented. It is the duty of counsel to give the page of the record at which the matter in controversy can be found and clearly present the argument and cite authority in support thereof. Consequently, this portion of his complaint is deemed waived. Rules 3.5(A)(5), 9.1, *Rules of the Court of Criminal*

dence. *See Id.* at 380 n. 4, 110 S.Ct. at 1198 n. 4, 108 L.Ed.2d at 329 n. 4.

*Appeals,* 22 O.S.1991, Ch. 18, App.); *Stohler v. State,* 751 P.2d 1087, 1089 (Okl.Cr.1988); *Johnson v. State,* 665 P.2d 815, 819 (Okl.Cr. 1982) (citing *Cox v. State,* 3 Okl.Cr. 129, 104 P. 1074 (1909)); *Conway v. State,* 483 P.2d 350, 352 (Okl.Cr.1971).

### B.

Appellant alleges a number of improprieties occurred in the second-stage closing which warrant modification.

■ Appellant first draws our attention to a comment by the prosecutor that the victim was trying to get out of the house but was overcome despite his "valiant effort." He observed he thought it was "tragic" the victim had to die in his own home. As with the other comments, this drew no objection, and is thus waived absent fundamental error. *Moore,* 788 P.2d at 398. We find none here. The position of the body and the blood on the outside storm door did indicate the victim attempted to get out of the house but was unable to. To that extent, it is a fair comment on the evidence. *Romano,* 847 P.2d at 380; *Clayton,* 840 P.2d at 29.

■ He next complains the prosecutor attempted to destroy his right to have the jury consider mitigating evidence in violation of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). He claims this occurred when the prosecutor commented there were lots of people around who had not been convicted of violent crimes, were youthful, had a disadvantaged childhood and limited formal educations; yet did not commit first-degree murder. We have held a prosecutor has the right to discuss evidence during the second stage in arguing for an appropriate punishment. *Nguyen v. State,* 769 P.2d 167, 172 (Okl.Cr.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989). We find this is the case here.

This proposition of error is without merit.

### V. MANDATORY SENTENCE REVIEW

■ This Court is required by 21 O.S. 1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1981, § 701.12. Pursuant to this mandate, we shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

The prosecution alleged two aggravating circumstances: that the murder was especially heinous, atrocious or cruel (21 O.S.1981, § 701.12(4); and the existence of a probability Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, § 701.12(7). The jury found only the first one: the murder was especially heinous, atrocious or cruel. We addressed Appellant's claim concerning the sufficiency of the evidence in III.C., above. Taken in the light most favorable to the prosecution, we find the evidence sufficient to support the aggravating circumstance found. *Battenfield v. State,* 816 P.2d 555, 565 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

As mitigation Appellant presented evidence showing he had been convicted of no violent crimes in the past; he is youthful; he had a disadvantaged childhood; he had a limited formal education; and he continued to deny actual physical involvement in the murder. Reviewing the evidence in mitigation and aggravation, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting reversal or modification, the judgment and sentence for Murder in the First Degree and the judgment and sentence for conspiracy to commit murder are AFFIRMED.

JOHNSON, V.P.J., specially concurs.

LANE, J., concurs in results.

CHAPEL, J., dissents.

STRUBHAR, J., concurs.

JOHNSON, Vice Presiding Judge, specially concurring.

While I specially concur with the opinion herein, I do wish to point out the slightly different interpretation of the Oklahoma Evidence Code. The appellant, as a leading proposition of error, refers to the reversible evidence that was admitted relative to the settlement of a civil lawsuit and implications that could be drawn therefrom. The Court cites to 12 O.S.1981 § 2408, which is basically identical to the Federal Evidence Rule 408.

The Court cites *Freeman v. State*, 767 P.2d 1354 (Okl.Cr.1988) and *Robinson v. State*, 743 P.2d 1088 (Okl.Cr.1987) to stand for the proposition that by adopting the federal rules our Legislature also adopted the philosophy and their interpretation of those rules as litigated in the federal courts. I am also mindful of *Laske v. State*, 694 P.2d 536 (Okl. Cr.1985) and also the chairman of the evidence subcommittee's statement in 12 O.S.A. Ch. 40, (West, 1981). While I agree with the general proposition that by adopting the federal rules, we basically adopted the philosophy and interpretation of the federal courts. That does not mean that this Court cannot have a different interpretation nor would the Court be precluded from a different finding based upon different wording in the Oklahoma Evidence Code. Although the Court should be generally bound by a federal court decision or decisions, that is not always the case. This Court has the authority to make a different finding as it relates to its interpretation of the rule or statute.

LANE, Judge, concurring in result.

I disagree with the majority in two respects. First, I cannot adopt the position of the majority that by testifying the appellant automatically changed the standard of review to be used by this Court. In the case relied on by the majority, *Lowrey v. State*, 87 Okl. Cr. 313, 197 P.2d 637 (1948), the defendant took the stand and testified as to what was supposed to be the facts. This provided the "direct evidence" relied upon by this Court. In the present matter, the defendant took the stand, but his testimony does not contain any purported evidence as to what occurred when the crime was committed. He simply testified that he was not there. It is my opinion that before *Lowrey* can be relied upon, testimony or evidence submitted by the defendant must contain direct evidence.

However, I do not think this disagreement changes the outcome of the case. My examination of the facts causes me to find that even when the wholly circumstantial evidence standard is used there is sufficient evidence to justify the jury finding the appellant guilty.

Second, I agree with Judge Chapel that the evidence of the settlement concerning the insurance money should not have been admitted against the appellant. Appellant was not a party to the agreement, and it does not reflect an admission against interest by him. However, I do not think that the prejudice created thereby was sufficient to cause a reversal of the conviction.

I therefore concur in result.

CHAPEL, Judge, dissenting.

I find evidence of the settlement agreement reached in the Trammell civil suit—which determined the distribution of the proceeds from the victim's insurance policy—to be irrelevant and prejudicial to the issues before the jury in the trial of William Mayes. Because of the admission of this evidence, I respectfully dissent from the majority's affirmance of Mayes' conviction and sentence.

During the guilt and innocence portion of Mayes' trial, the State introduced the testimony of Hank Anderson, the attorney who represented Margaret Trammell's children in a federal stakeholder's suit concerning the distribution of the proceeds from the victim's life insurance policy. Anderson testified that, under the terms of the settlement reached in this civil suit, Margaret Trammell was to receive twenty percent of the proceeds from the policy and Trammell's children were to receive eighty percent of the proceeds. Mayes was not a party to or a beneficiary of this settlement.

While the settlement agreement may be relevant as to Margaret Trammell's criminal liability, under the facts of this case, the Trammell settlement agreement was totally irrelevant to Mayes' guilt or innocence.[1] *See generally Yoder v. State,* 66 Okl.Cr. 178, 672, 90 P.2d 669 (1939) (admission of evidence of settlement negotiations which were not authorized by defendant constituted prejudicial error). Mayes was not a party to the settlement nor did he receive any of the proceeds of the victim's insurance policy as part of the settlement. Thus, the agreement revealed nothing about Mayes' liability, either civil or criminal.

This evidence prejudiced Mayes. *See Yoder v. State, supra.* Margaret did not take the stand and Mayes could not question her about her motivations behind the settlement agreement. Using such evidence to convict Mayes was highly prejudicial and improper. Accordingly, I conclude that Mayes' conviction and sentence must be reversed and the case remanded for a new trial.

Although I would reverse for the above-stated reason, I also feel compelled to address two other issues. In *Duvall v. State,* 825 P.2d 621, 630 (Okl.Cr.1991), cert. denied, —— U.S. ——, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992), the Court modified the language in OUJI–CR 104.9 Alternate 2, which is an instruction given to the jury during voir dire. The instruction reads:

"If selected as a juror, and you find that the law and evidence in this case warrants the recommendation of the death penalty, could you vote to recommend that penalty?"

*Id.* (emphasis added). I do not feel the use of the terms "recommendation" or "recommend" accurately reflects our sentencing scheme.

Section 926 of Title 22 O.S.1991 provides:

In all cases of a verdict of conviction for any offense against any of the laws of the State of Oklahoma, the jury may, and shall upon the request of the defendant assess and declare the punishment in their verdict within the limitations fixed by law, and the court shall render a judgment according to such verdict, except as hereinafter provided.

Thus the jury verdict sentencing a defendant to death is more than simply a "recommendation"; it is in fact the sentence that will be imposed. *See also Luker v. State,* 552 P.2d 715, 719 (Okl.Cr.1976) ("where the jury declare the punishment in their verdict within the limitations fixed by law, the district courts of this State must render a judgment according to such verdict and are without authority to modify the punishment assessed by the jury in pronouncing judgment upon the conviction"); *Brown v. State,* 314 P.2d 362 (1957) (same); *Bean v. State,* 77 Okl.Cr. 73, 138 P.2d 563 (1943) (same). Because the sentence set by the jury will be the sentence imposed on the defendant, I would use the terms "imposition" and "impose" in the instruction to the jury rather than the terms "recommendation" or "recommend."

Secondly, I disagree with the majority's conclusion that an instruction on life without the possibility of parole in the sentencing phase of the trial is not necessary even when requested by the defendant. In my opinion, this finding is inconsistent with the legislative intent underlying the life without parole sentencing option in capital murder cases.

This Court has long recognized that issues concerning pardon or parole decisions rest with the executive branch of the government and lie outside the province of the jury. *Miller v. State,* 522 P.2d 642 (Okl.Cr.1974). However, in capital cases, the Legislature has provided the jury with a sentencing option that specifically refers to parole. In capital cases the Legislature has made clear it intends for the jury to consider parole in determining which sentence should be imposed on the defendant. In accordance with this legislative intent, I think it appropriate, at the request of defense counsel, for the

---

1. The majority's discussion of 12 O.S.1981, § 2408 is unnecessary because the evidence of the settlement agreement is inadmissible on the grounds of relevancy.

trial court to instruct the jury as to how the sentence of life without parole would be treated under Oklahoma law. *See generally Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

Article VI, section 10 of the Oklahoma Constitution sets out the limitations and authority of the Pardon and Parole Board and the Governor in granting relief to a defendant who has been sentenced to life without parole. An instruction based on this provision would be useful. Article VI, section 10 provides, in pertinent part:

> [T]he Pardon and Parole Board shall have no authority to make recommendations regarding parole for convicts sentenced to death or sentenced to life imprisonment without parole.

> The Governor shall have the power to grant, after conviction and after favorable recommendation by a majority vote of the said Board, commutations, pardons and paroles for all offenses, except cases of impeachment, upon such conditions and with such limitations as he may deem proper, subject to such regulations as may be prescribed by law. Provided, the Governor shall not have the power to grant paroles if a convict has been sentenced to death or sentenced to life imprisonment without parole.

An instruction based on this constitutional provision would (1) provide the jury with a clearer understanding of the life without parole option under Oklahoma law and (2) implement the legislative intent underlying the life without parole option. *Accord State v. Henderson,* 109 N.M. 655, 658–59, 789 P.2d 603, 606–607 (1990); *Bruce v. State,* 318 Md. 706, 569 A.2d 1254 (1990); *Doering v. State,* 313 Md. 384, 545 A.2d 1281, 1292–95 (1988).

For the reasons stated above, I believe that Mayes' conviction should be reversed and the case remanded for a new trial. Accordingly I dissent.

## ORDER DENYING REHEARING AND DIRECTING ISSUANCE OF MANDATE AND CORRECTION ORDER

 Petitioner has filed a Petition requesting this Court grant rehearing and stay the mandate in *Mayes v. State,* 887 P.2d 1288. In it, Appellant alleges three reasons why rehearing should be granted: the cumulative effect of harmless errors; reliance on a case used in determining the scope of review to be used when examining the sufficiency of the evidence; and reliance on inaccurate factual grounds to uphold his judgment and sentence.

We find Petitioner is not entitled to a rehearing. He failed to present a cumulative error argument to this Court in his brief-in-chief, and has thus waived it for consideration at this time. *See Brown v. State,* 871 P.2d 56, 68 (Okl.Cr.1994) (propositions of error submitted for the first time in supplemental briefs deemed waived for consideration on direct appeal). In any event, this Court determined each of the errors to be harmless, and the single error of constitutional magnitude to be harmless beyond a reasonable doubt. We see no basis in the petition to revisit those errors.

Appellant has appropriately brought to this Court's attention two minor errors which, although they had no bearing on the Court's determination of the case, require correction. We correct those segments of the opinion below.

Therefore, Appellant has failed to show that our opinion in this case conflicts with current case law or an express statute; and he has not presented this Court with some question decisive of the case that has been submitted by the attorney of record and overlooked by this Court. Those are the sole grounds upon which rehearing can be based. *See* 22 O.S.1991, Ch. 18, App. *Rules of the Court of Criminal Appeals,* Rule 3.14(B)(1) & (2).

In addition, we hereby make the following corrections in this Court's opinion:

[Editor's Note: Changes ordered have been incorporated into the opinion.]

IT IS SO ORDERED.

/s/ Gary L. Lumpkin
GARY L. LUMPKIN, Presiding Judge

/s/ Charles A. Johnson
CHARLES A. JOHNSON, Vice
Presiding Judge

/s/ James F. Lane
JAMES F. LANE, Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL, Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR, Judge